**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Daniel ORIAKHI, Defendant–Appellant.**

No. 93–5252.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 2, 1995.

Decided June 22, 1995.

**ARGUED:** William H. Murphy, Jr., Baltimore, MD, for appellant. Katharine J. Armentrout, Asst. U.S. Atty., Baltimore, MD, for appellee. **ON BRIEF:** Lynne A. Battaglia, U.S. Atty., Robert R. Harding, Asst. U.S. Atty., Baltimore, MD, for appellee.

Before NIEMEYER, Circuit Judge, PHILLIPS, Senior Circuit Judge, and YOUNG, Senior United States District Judge for the District of Maryland, sitting by designation.

Affirmed by published opinion. Judge NIEMEYER wrote the opinion, in which Senior Judge YOUNG joined, and Senior Judge PHILLIPS wrote a specially concurring opinion.

**OPINION**

NIEMEYER, Circuit Judge:

Daniel Oriakhi was indicted by a grand jury in the District of Maryland for participating in a conspiracy to distribute heroin and for possessing heroin with the intent to distribute on two separate occasions. During trial, the government introduced evidence seized in two separate searches in the New York area in December 1990, as well as evidence obtained through court-approved wiretaps. Oriakhi was convicted on all counts and sentenced to 300 months imprisonment. He now challenges various aspects of his trial, contending principally that both searches in the New York area were illegal, that the wiretaps were illegally obtained, and therefore that important evidence obtained from these searches and wiretaps should not have been admitted at trial. Finding his arguments unpersuasive, we affirm.

I

During the period from late 1988 through April 1990, two large scale heroin distribution organizations were operating in the Baltimore area, one headed by Robert Dowdy, the other by Linwood Williams. Both organizations were supplied heroin by Daniel Oriakhi and his partners. Oriakhi originally worked with his brother, Felix Oriakhi, to smuggle heroin into the United States from their native Nigeria. When Daniel and Felix Oriakhi broke off their relationship in the late fall of 1989, Daniel Oriakhi formed a new partnership with Raymond Ebo, who resided in New York. Together Daniel Oriakhi and Ebo continued to supply heroin to the Dowdy and Williams organizations in Baltimore. Oriakhi and Ebo sent couriers to Nairobi, Kenya, to obtain kilogram quantities of heroin from a Nairobi supplier and then to smuggle the drugs into the United States for distribution.

Oriakhi's participation as a supplier to the Baltimore organizations first came to the government's attention in 1989 during an investigation of the Dowdy and Williams organizations by the Baltimore police and the federal Drug Enforcement Administration (DEA). Government agents were able to observe Daniel Oriakhi actually deliver heroin to Dowdy at Dowdy's apartment in Baltimore and to Williams at the Owings Mills Mall north of Baltimore. Surveillance officers also followed Oriakhi and observed him hand two men a bag which was later seized and found to contain $47,000 in cash.

When Dowdy was arrested in February 1990, he agreed to cooperate with the government's ongoing investigation of the Baltimore organizations. Oriakhi's brother Felix was arrested a short time later, but Daniel Oriakhi fled the United States to Nigeria. Notwithstanding his flight, in June 1990 Daniel Oriakhi was indicted along with seven others for conspiracy to import heroin into the United States in violation of 21 U.S.C. § 963.

Oriakhi returned to the United States later in the summer of 1990 with a false passport issued in the name of "Adoga Smith." Oriakhi apparently continued his drug enterprise under the names "Adoga Smith" and "The Adoga Smith Company," although government officials were not able at the time to connect Oriakhi with his "Adoga Smith" alias.

Still unaware in December 1990 that "Adoga Smith" was an alias for Oriakhi, federal officials conducted two separate searches of "Adoga Smith" in the New York area on December 10 and December 13. On December 10, 1990, at Port Elizabeth, New Jersey, U.S. Customs Inspectors examined several hundred dock receipts for cargo containers with foreign destinations. The inspectors were looking for "unusual shipments," including shipments bound for narcotic source countries or countries subject to embargo and shipments accompanied by incomplete or suspicious paperwork. One of the receipts they examined was for a 40–foot container bound for Lagos, Nigeria, which purportedly contained a Nissan 300–ZX and household and personal effects, but which otherwise gave "very vague" information and omitted any identification of a shipper or a consignee. An initial search of the container disclosed that many of the items were marked with labels of the "Adoga Smith Company." After customs officials received information that "Adoga Smith" might be involved in heroin trafficking, they conducted more extensive searches of the container. They learned, *inter alia,* that the Nissan 300–ZX was registered to a non-existent address in Brooklyn, New York. Several months later, customs officials effected a forfeiture of the container's contents, some of which were used as evidence against Oriakhi in his trial in the District of Maryland.

Three days after the search in Port Elizabeth, an independent search was conducted of Oriakhi at the J.F.K. International Airport in New York. Oriakhi had checked some luggage under "Adoga Smith" on a Swissair flight bound for Zurich, Switzerland, but Oriakhi's bags were checked through to Lagos, Nigeria. A Swissair official, as a matter of course, notified the U.S. Customs Contraband Enforcement Team that some baggage had been checked through to Nigeria and was about to be loaded onto the plane. The Contraband Enforcement Team typically scrutinizes freight and passengers arriving from and departing to locations considered suspicious for one of several reasons. High risk areas on the in-bound side include narcotic source countries and "transit countries" from which seizures have been made in the past. On the out-bound side, the Team focuses on passengers and baggage headed for countries considered to be high risk destinations for the illegal export of U.S. currency or critical technology. The Team regards Nigeria as a high risk country on in-bound flights because of the potential for concealed narcotics and a "light risk" country on out-bound flights because of the potential for the export of currency which may be the proceeds from drug trafficking.

Customs officials at J.F.K. proceeded to examine the bags checked by Oriakhi for destination to Lagos, Nigeria, in the Swissair baggage room with a portable x-ray machine. The x-ray of one suitcase disclosed the image of a handgun. The inspectors opened the suitcase and found two 9mm semi-automatic handguns and 10 boxes of 9mm ammunition. They then learned that the suitcase had been checked by a passenger named "Adoga Smith" and proceeded to open and search the other bags checked under that name. The inspectors found $10,000 in $100 bills in the pocket of a pair of pants in one of the other bags.

A customs officer then had Swissair make an announcement requesting "Adoga Smith" to disembark from the plane. Oriakhi voluntarily walked off the plane and was questioned by the customs officer on the Jetway. After examining his passport, the officer explained to Oriakhi that currency reporting laws required anyone leaving the country with $10,000 or more to fill out a particular form. The officer asked Oriakhi to fill out such a form, which he did, declaring that he was leaving the country with only $2,000. The officer then searched Oriakhi's person by patting him down. Numerous packets of U.S. currency totalling $97,000 were discovered on Oriakhi's person. An additional $5,000 was recovered from the attache case he was carrying. The customs officer read Oriakhi his *Miranda* warnings and arrested him, charging him in the Eastern District of New York with currency and weapons violations. But law enforcement officials were still unaware of Oriakhi's true identity or that he was the subject of an indictment in Maryland.

Subsequently in Maryland, a cooperating witness, Barbara Obot, who had acted as a courier for Oriakhi, informed officers that Oriakhi had been arrested in New York under the name "Adoga Smith." A writ of habeas corpus was issued for Oriakhi from the District of Maryland and he was returned and reindicted by a federal grand jury in three counts, charging him with (1) conspiracy to distribute and to possess with intent to distribute heroin from late 1988 until April 1990; (2) possession with intent to distribute heroin on or about February 5 and 6, 1990; and (3) possession with intent to distribute heroin on or about February 18 to 22, 1990. The original indictment in which Oriakhi had been charged with seven others for conspiracy to import heroin was dismissed.

Oriakhi filed motions to suppress evidence obtained from the New York searches and wiretaps, which were denied. In December 1992 the jury found Oriakhi guilty on all counts. The court sentenced Oriakhi to concurrent terms of 300 months imprisonment on each count. The sentences were also designated to run concurrently with the sentence imposed by the Eastern District of New York for the currency and firearms violations.

## II

■ Oriakhi's strongest argument on appeal is his challenge to the admission of evidence seized during the New Jersey port search of his freight container and the New York airport search of his luggage in December 1990. Neither search was conducted pursuant to a warrant. Oriakhi contends that the searches were conducted in violation of his Fourth Amendment rights because they were conducted without probable cause or even reasonable suspicion.[1] Although Oriakhi acknowledges that these searches occurred "at the border"[2] and that routine searches of persons and effects *entering* the country may be conducted at the border without a warrant, probable cause, or any level of individualized suspicion, he contends that this border search exception to the Fourth Amendment does not apply to persons and their effects *leaving* the country. He argues that the principal case articulating the border search exception to the Fourth Amendment, *United States v. Ramsey*, 431 U.S. 606, 97 S.Ct. 1972, 52 L.Ed.2d 617 (1977), is ambiguous as to whether the exception applies to exit searches. In *Ramsey*, the Court summarized the centuries-old doctrine:

Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be "reasonable" by the single fact that the person or item in question had entered into our country from outside. There has never been any additional requirement that the reasonableness of a border search depended on the existence of probable cause. This longstanding recognition that searches at our bor-

---

1. Oriakhi also contends that the searches, which were prompted by concerns about drugs and money, were prohibited by statute. But this argument is refuted by the only applicable statute, 31 U.S.C. § 5317(b), which authorizes warrantless border searches for purposes of enforcing the currency reporting requirements in § 5316. Section 5317(b) states that "a customs officer may stop and search, at the border and without a search warrant, any vehicle, vessel, aircraft, or other conveyance, any envelope or other container, and any person entering *or departing* from the United States." (Emphasis added). Significantly, in 1986 Congress removed the "reasonable cause" requirement from this provision, thereby intending to authorize border searches to the full extent permitted by the Constitution. *See United States v. Benevento*, 836 F.2d 60, 68–69 n. 1 (2d Cir.1987), *cert. denied*, 486 U.S. 1043, 108 S.Ct. 2035, 100 L.Ed.2d 620 (1988).

 Oriakhi argues in response that the authorities in New Jersey and New York were not searching for currency but were actually searching for "critical technology" and armaments, which by statute would require "reasonable cause." *See* 50 U.S.C. app. § 2411(a)(2)(B); 22 U.S.C. § 2778(e). However, Oriakhi produces no evidence showing that the inspectors in New Jersey and New York were specifically looking for "critical technology" or defense articles. Moreover, even if these statutes were triggered by the searches in question, it is not clear that the exclusionary rule would apply to a *statutory* violation if the searches were constitutionally permissible.

2. Oriakhi does not dispute that the Port Elizabeth and J.F.K. Airport searches were conducted at the functional equivalent of the border. *See Almeida–Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973).

ders without probable cause and without a warrant are nonetheless "reasonable" has a history as old as the Fourth Amendment itself. We reaffirm it now.

*Id.* at 619, 97 S.Ct. at 1980 (footnote omitted). Oriakhi emphasizes that *Ramsey* 's language is not clear as to whether its holding applies only to persons and objects "enter[ing] into our country from outside," or more broadly to all "searches at our borders." *Id.* He thus contends that "considerable controversy exists as to whether the border search exception applies to searches of persons and their belongings exiting the country," and he urges us to adopt his narrow reading of *Ramsey*.

The issue of whether the border search exception to the Fourth Amendment's reasonableness requirement extends to exit searches is one of first impression in this circuit. While this circuit has yet to rule on this issue, every other circuit addressing the issue has held that the exception applies regardless of whether the person or items searched are entering or exiting the United States.[3] Although Oriakhi correctly notes that several of these appellate decisions were made by divided courts, any "considerable controversy" that may have existed on the scope of the border search exception has now been replaced by a considerable consensus. The one case on which Oriakhi relied, *United States v. Ezeiruaku,* 754 F.Supp. 420 (E.D.Pa.1990), had been reversed by the Third Circuit in *United States v. Ezeiruaku,* 936 F.2d 136 (3d Cir.1991), well in advance of Oriakhi's trial.[4]

The rationale for exempting border searches from the Fourth Amendment's probable cause and warrant requirements rests on fundamental principles of national sovereignty, which apply equally to exit and entry searches. Even though Oriakhi places great emphasis on language in *Ramsey* that "[t]he border search exception is grounded in the recognized right of the sovereign to control ... who and what may *enter* the country," 431 U.S. at 620, 97 S.Ct. at 1980 (emphasis added), we note that the Supreme Court also emphasized that the right to control who and what enters the country is derived from a broader and more basic principle, the "long-standing right of the sovereign to protect itself." *Id.* at 616, 97 S.Ct. at 1978.

National sovereignty is the undivided power of a people and their government within a territory, and a nation draws on that power when it acts in relationship to other nations. The sovereign power does not depend on a particular form of internal or domestic governmental organization. Thus, regardless of how power is organized and divided within a nation's territory, inherent in national sovereignty are the overarching rights of a nation to defend itself from outside threats, to act in relation to other nations, and to secure its territory and assets. *See, generally, United States v. Curtiss–Wright Export Corp.,* 299 U.S. 304, 315–18, 57 S.Ct. 216, 218–20, 81 L.Ed. 255 (1936) (explaining that the United States' power to act as a sovereign nation is defined "not in the provisions of the Constitution, but in the law of nations"). From the sovereign's power to protect itself is derived its power to exclude harmful influences, including undesirable aliens, from the sovereign's territory, *see id.* at 318, 57 S.Ct. at 220; *United States v. Montoya de Hernandez,* 473 U.S. 531, 544, 105 S.Ct. 3304, 3312, 87 L.Ed.2d 381 (1985),

**3.** *See, e.g., United States v. Ezeiruaku,* 936 F.2d 136, 143 (3d Cir.1991); *United States v. Hernandez–Salazar,* 813 F.2d 1126, 1137 (11th Cir. 1987); *United States v. Des Jardins,* 747 F.2d 499, 504 (9th Cir.1984); *United States v. Udofot,* 711 F.2d 831, 839–40 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Ajlouny,* 629 F.2d 830, 834 (2d Cir.1980), *cert. denied,* 449 U.S. 1111, 101 S.Ct. 920, 66 L.Ed.2d 840 (1981).

**4.** Although the Supreme Court has not yet ruled directly on the question of whether the border search exception to the Fourth Amendment ap-

plies to persons leaving the country, a chambers opinion and other dicta suggest that it does. *See Julian v. United States,* 463 U.S. 1308, 103 S.Ct. 3522, 77 L.Ed.2d 1290 (Rehnquist, Circuit Justice 1983) (applying border search exception articulated in *Ramsey* to a person and his effects as he attempted to *depart* the country on a flight destined for Peru); *California Bankers Ass'n v. Shultz,* 416 U.S. 21, 63, 94 S.Ct. 1494, 1518, 39 L.Ed.2d 812 (1974) (dicta) (suggesting that those "entering *and leaving* the country may be examined as to their belongings and effects, all without violating the Fourth Amendment" (emphasis added)).

as well as its power to prohibit the export of its currency, national treasures, and other assets. *See, e.g., United States v. Hernandez–Salazar*, 813 F.2d 1126, 1138 (11th Cir. 1987) (addressing currency). In exercise of the sovereign's right to protect itself, it has long been recognized that the sovereign must be able to conduct routine searches of persons and their effects at its borders. As the Court noted in *Ramsey*, a routine border search has for this reason always been excepted from the requirements of the Fourth Amendment. For the same reason, a border search that goes beyond the routine is nevertheless justified merely by reasonable suspicion, a lesser standard than required for analogous non-border searches. *See Montoya de Hernandez*, 473 U.S. at 541, 105 S.Ct. at 3310.

While it is undoubtedly true that border searches are more often conducted in furtherance of the sovereign's interest in excluding undesirable outside influences, such as entrants with communicable diseases, narcotics, or explosives, *see e.g. Montoya de Hernandez*, 473 U.S. at 544, 105 S.Ct. at 3312, that interest in *exclusion* is not the only function of the border search. As important is the sovereign's interest in regulating foreign commerce and, in particular, in regulating and controlling its currency. The economic lifeblood of a nation is drawn from its monetary supply, and the protection of the nation's currency is crucial to its economic survival. Other courts have similarly recognized the paramount importance of regulating currency in analyzing the "reasonableness" of exit searches. As the Eleventh Circuit observed:

> The governmental interest in stemming the flow of unreported currency out of the United States is substantial.... The "long-standing right of the sovereign to protect itself" that underlies the traditional rationale for the border search exception is implicated to a substantial degree where the international borders of the United States are penetrated by large sums of undeclared currency departing this country.

*Hernandez–Salazar*, 813 F.2d at 1138 (footnotes omitted).

While the sovereign's ability to regulate its currency is important in itself, it is even more significant in light of the overwhelming flow of illegal narcotics into the United States. Regulating the export of currency provides a mechanism for controlling the import of narcotics since there must be an accompanying outflow of cash to pay for the import of billions of dollars worth of illegal drugs. It is therefore also recognized that the "dictates of public policy [against drug trafficking] reinforce the necessity of identifying, if not monitoring or controlling, a cash outflow from the country as well as an influx of narcotics into the country." *Ezeiruaku*, 936 F.2d at 143.

In sum, even though in *Ramsey* the border search under consideration involved opening mail used to *import* heroin into the United States, the principles articulated in that case also apply to the sovereign interest of protecting and monitoring exports from the country, including, importantly, its currency. Accordingly, we join the several other circuit courts which have held that the *Ramsey* border search exception extends to all routine searches at the nation's borders, irrespective of whether persons or effects are entering or exiting from the country.

In this case, the search of "Adoga Smith's" freight container at Port Elizabeth, New Jersey, was a routine border search directed at exports to suspect countries and exports without appropriate paperwork. And the independent search of "Adoga Smith" at J.F.K. airport was similarly directed routinely at the illegal export of U.S. currency. Both searches began as routine and were expanded only as further information developed. Even though the searches were not conducted upon probable cause or pursuant to a warrant and were conducted upon a person *exiting* from the country, each search fell properly within the border search exception to the Fourth Amendment.

### III

Oriakhi also contends that evidence obtained through a court-approved wiretap monitoring the operations of the Dowdy and Williams narcotics organizations should have

been excluded from evidence at trial because the wiretaps were not properly approved.

■ Electronic eavesdropping by law enforcement personnel is governed by the federal wiretap statute, codified at 18 U.S.C. § 2510, et seq. Prior to granting an order authorizing a wiretap, the issuing judge must find, in addition to probable cause, that "normal investigative procedures have been tried and have failed or reasonably appear to be unlikely to succeed if tried or to be too dangerous." 18 U.S.C. § 2518(3)(c). Oriakhi argues that the government failed to meet its burden on this "exhaustion" requirement. He maintains that the affidavits offered in support of the wiretaps provided only "boilerplate" explanations of why "normal investigative procedures" were inadequate.

■ The purpose of 18 U.S.C. § 2518(3)(c) is to ensure that the relatively intrusive device of wiretapping is "not resorted to in situations where traditional investigative techniques would suffice to expose the crime." United States v. Kahn, 415 U.S. 143, 153 n. 12, 94 S.Ct. 977, 983 n. 12, 39 L.Ed.2d 225 (1974). But as we have repeatedly held, "the burden that these provisions impose upon the government to show the inadequacy of normal investigative techniques is not great, and the adequacy of such a showing is 'to be tested in a practical and commonsense fashion,' ... that does not 'hamper unduly the investigative powers of law enforcement agents.'" United States v. Smith, 31 F.3d 1294, 1297 (4th Cir.1994) (citations omitted), cert. denied, —— U.S. ——, 115 S.Ct. 1170, 130 L.Ed.2d 1124 (1995). While the government's burden is not great, it still may not make the required showing through a "mere 'boilerplate recitation of the difficulties of gathering usable evidence.'" United States v. Leavis, 853 F.2d 215, 221 (4th Cir.1988). Rather, the government must base its need on real facts and must specifically describe how, in the case at hand, it "has encountered difficulties in penetrating [the] criminal enterprise or in gathering evidence" with normal techniques "to the point ... where wiretapping becomes reasonable." Smith, 31 F.3d at 1298 (citations and internal quotations omitted).

■ In this case, the government's affidavits specifically detailed how it exhausted reasonable alternatives to investigate the Dowdy and Williams organizations through surveillance, telephone tolls, informants, and attempts to establish undercover operatives. The affidavits also set forth the difficulties involved in establishing undercover contact with Oriakhi given that Oriakhi was new to the country, spoke a foreign language, and knew few people in the area. While the several affidavits for the various wiretaps involved may have relied on the same facts, their recitation was not boilerplate. An appellate court owes "considerable deference" to the district court's determination that "exhaustion" has been shown, see id., and on these facts, the district court's findings are amply supported.

## IV

Oriakhi contends next that the court improperly allowed Robert Dowdy, a co-conspirator, and Special Agent Rivello to testify that the voice heard on several incriminating audio tapes was Oriakhi's. He argues (1) that Dowdy's testimony was obtained through an impermissibly suggestive procedure and (2) that Rivello's testimony was based on conversations he had with Oriakhi which themselves would not be admissible in evidence, such as plea discussions. We reject both contentions.

■ Regarding Dowdy's testimony, Oriakhi asserts that Dowdy made his identification by listening to the tapes with the aid of a government-prepared transcript containing portions of dialogue labeled with the name of "Daniel Oriakhi." We agree that if the record revealed that this was how Dowdy made his identification, Oriakhi's challenge on appeal might have merit. However, the record does not support this assertion. Although the transcript of Dowdy's testimony is not conclusive on this point, it is sufficiently clear to affirm the district court's finding that Dowdy initially identified the voice on the tapes based solely on Dowdy's personal knowledge of Oriakhi's voice and his interaction with Oriakhi spanning a period of almost one year. Dowdy specifically testified that no one told him in advance whose voices he

was about to hear. Only *after* Dowdy independently identified Oriakhi's voice did the government ask Dowdy to review the tapes again while following along with the draft transcripts bearing Oriakhi's name to determine whether the transcripts were accurate. Regarding the voice identification of Oriakhi made by Special Agent Rivello, Agent Rivello testified that he was able to make the identification because "I have spoken to [Oriakhi] myself and on several occasions, I have heard him speak." During the suppression hearing outside the presence of the jury, Rivello informed the court that he recognized the sound of Oriakhi's voice based on three occasions when he had heard Oriakhi speak: (1) during plea discussions between Oriakhi, Oriakhi's counsel, and prosecutors; (2) in several brief, informal conversations with Oriakhi while escorting Oriakhi to several proffer sessions; and (3) at an earlier suppression hearing where Oriakhi testified. Oriakhi argues that Rivello's reliance on these conversations to identify Oriakhi's voice violated his rights under the Fifth and Sixth Amendments, and contravened Federal Rule of Criminal Procedure 11(e)(6) (restricting admissibility of statements during plea discussions).

■■■■■ Oriakhi does not dispute the well-settled rule that the sound of a defendant's voice, even if heard during privileged communications, is not itself testimonial, and therefore is not protected by the Fifth Amendment privilege against self-incrimination. *See United States v. Dionisio*, 410 U.S. 1, 8, 93 S.Ct. 764, 768–69, 35 L.Ed.2d 67 (1973); *Doe v. United States*, 487 U.S. 201, 210, 108 S.Ct. 2341, 2347, 101 L.Ed.2d 184 (1988) ("in order to be testimonial, an accused's communication must itself, explicitly or implicitly, relate a factual assertion or disclose information."). Indeed, Oriakhi recognizes that a criminal suspect may be compelled to furnish a voice exemplar without impinging on Fifth Amendment protections. *See id.* Rather, Oriakhi argues that since Agent Rivello "*could* have easily identified him from his thought processes and the content of his speech, both of which are testimonial and protected by the Fifth Amendment" (emphasis added), the voice identification made by Rivello was presumptively inadmis-

sible. Furthermore, he claims, without citing any authority, that the government had the burden of proving that Agent Rivello's identification was based on the sound of Oriakhi's voice rather than the content of his speech. Aside from these bald assertions, Oriakhi has failed to explain how Rivello may have identified his voice by the content of what he said rather than the sound of his voice. Beyond this, it was for the factfinder to determine whether Agent Rivello testified truthfully when he stated that he made his identification based on the *sound* of Oriakhi's voice.

■■■ Oriakhi also claims that his Sixth Amendment right to counsel, as set forth in *Massiah v. United States*, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed.2d 246 (1964), was violated when Agent Rivello heard Oriakhi's voice without the active participation of counsel to protect him from making unwise or improper disclosures. In *Gilbert v. California*, 388 U.S. 263, 87 S.Ct. 1951, 18 L.Ed.2d 1178 (1967), however, the Court held that the government could take a handwriting exemplar from a defendant without the presence of counsel because taking the sample was not a "critical stage" of the proceedings and any inaccuracy in the exemplar could be corrected in the adversary process at trial. *Id.* at 267, 87 S.Ct. at 1953. The Court's reasoning in *Gilbert* would likewise apply to the taking of a voice exemplar. Since Agent Rivello's hearing the sound of Oriakhi's voice was the functional equivalent of taking a voice sample, the fact that Agent Rivello happened to hear Oriakhi's voice outside the presence of counsel while informally speaking with Oriakhi during escorts did not violate Oriakhi's Sixth Amendment rights.

■■■ Finally, Oriakhi's argument that Federal Rule of Criminal Procedure 11(e)(6) forbids any use of statements made by an accused to the government during plea discussions fails for similar reasons. This rule, which is intended to promote active and open plea negotiations, limits the admissibility of *statements*, but does not protect the sound of an accused's voice, no more than it protects against any other descriptive aspect of the accused. As the government relied only on the sound of Oriakhi's voice and not on any

statements made by him, Rule 11(e)(6) does not require suppression of Agent Rivello's voice identification of Oriakhi.

## V

During the course of the trial, the prosecution admitted into evidence numerous tapes of Oriakhi's telephone conversations intercepted by government agents. On appeal, Oriakhi singles out one of these tapes, known as "Tape–67," and demands an evidentiary hearing to rebut the government's claim that the tape was properly minimized under 18 U.S.C. § 2518(5), which requires that wire interceptions "be conducted in such a way as to minimize the interception of communications not otherwise subject to interception."

The wiretapping statute does not require that all innocent communications be left untouched. Rather, it requires simply that unnecessary intrusions into speakers' privacy be minimized or "reduced to the smallest degree possible." *See United States v. Clerkley* 556 F.2d 709, 716 (4th Cir.1977), *cert. denied sub nom. London v. United States,* 436 U.S. 930, 98 S.Ct. 2830, 56 L.Ed.2d 775 (1978). In determining whether the minimization requirements of § 2518(5) have been met, courts apply a standard of "reasonableness" on a case-by-case basis. *Id.* "[T]he minimization requirement is satisfied if 'on the whole the agents have shown a high regard for the right of privacy and have done all they reasonably could to avoid unnecessary intrusion.'" *United States v. Armocida,* 515 F.2d 29, 42 (3d Cir.), *cert. denied sub nom. Conti v. United States,* 423 U.S. 858, 96 S.Ct. 111, 46 L.Ed.2d 84 (1975) (citation omitted).

The tape in question, Tape–67, contains a conversation between Daniel Oriakhi and the wife of his brother, Felix Oriakhi, which entire conversation was played for the jury. Oriakhi claims that the conversation was completely personal in nature and unrelated to any offense with which Oriakhi was charged. The government responds that, while neither of the parties to the conversation explicitly mentioned drugs or drug trafficking, a constantly recurring subject was the money which Daniel Oriakhi intended to

send to his family in Nigeria. The government argues that most of the conversation was highly relevant because at the time the conversation was intercepted, the government was investigating Oriakhi's role in a drug conspiracy which involved exporting drug proceeds to Nigeria.

Given the nature of the government's investigation into the export of drug proceeds and into the importation and distribution of drugs in this case, we find no error in the district court's conclusion that admission of the entire Tape–67 was reasonable under 18 U.S.C. § 2518(5).

## VI

Finally, Oriakhi contends that his trial was fundamentally unfair because the district court refused his request to define "reasonable doubt" in the jury instructions. It is well settled in this circuit that a district court should not attempt to define the term "reasonable doubt" in a jury instruction absent a specific request for such a definition from the jury. *See, e.g., United States v. Headspeth,* 852 F.2d 753, 755 (4th Cir.1988). We have repeatedly concluded that the words "beyond a reasonable doubt" have the meaning generally understood for them and that further efforts to restate their meaning with different words tend either to alter or to obfuscate that meaning. *See, e.g., United States v. Reives,* 15 F.3d 42, 45 (4th Cir.) ("there is no better way of explaining the concept"), *cert. denied,* —— U.S. ——, 114 S.Ct. 2679, 129 L.Ed.2d 813 (1994). *See also Victor v. Nebraska,* —— U.S. ——, ——, 114 S.Ct. 1239, 1243, 127 L.Ed.2d 583 (1994) ("the Constitution neither prohibits trial courts from defining reasonable doubt nor requires them to do so as a matter of course."). As we observed in *Reives:*

> If there is a definition that can clarify the meaning of reasonable doubt, common sense suggests that such a definition be offered to *all* juries, even those that do not venture a request. But until we find a definition that so captures the meaning of "reasonable doubt" that we would mandate its use in all criminal trials in this circuit, we cannot hold that it is error to refuse to give some definition.

15 F.3d at 46. We therefore hold again that the district court was correct in refusing Oriakhi's request to instruct the jury on the definition of "reasonable doubt."

For the reasons given, the judgment of the district court in this case is

*AFFIRMED.*

PHILLIPS, Senior Circuit Judge, specially concurring:

I concur in the judgment and in Parts I, III, IV, V, and VI of the majority opinion. I write separately because I would affirm the judgment on different grounds than those relied on by the majority in Part II of its opinion. I understand the majority there to hold that the "border search exception" to the Fourth Amendment—which permits government agents to conduct "routine" searches of persons and things entering the country even absent any degree of particularized suspicion[1]—applies to searches of persons and things exiting, as well as entering, the country. I believe that that critical constitutional holding is not necessary in order to resolve this case and affirm the judgment. And, with all respect, I believe that whether it conforms to Supreme Court precedent is a far more equivocal issue than the majority acknowledges. For these reasons—non-necessity to decision and closeness of the issue—I would avoid the issue *vel non* of the border search exception's applicability to exit searches. I would instead uphold the two border searches here at issue as consistent with ordinary "interior" Fourth Amendment jurisprudence, specifically on the basis that neither was "unreasonable" within the meaning of settled Fourth Amendment doctrine.

I.

A conclusion that the ordinary rules of Fourth Amendment jurisprudence, rather than the border search "exception," govern exit searches need not entail that the searches here at issue were unreasonable just because they were conducted without a warrant issued upon probable cause. Neither probable cause nor a warrant is invariably required whether at the international borders or in the interior. "Although the underlying command of the Fourth Amendment is always that searches and seizures be reasonable, what is reasonable depends on the context within which a search takes place." *New Jersey v. T.L.O.*, 469 U.S. 325, 337, 105 S.Ct. 733, 740, 83 L.Ed.2d 720 (1985). The Supreme Court repeatedly has emphasized that "the permissibility of a particular practice 'is judged by balancing its intrusion on the individual's Fourth Amendment interests against its promotion of legitimate government interests.'" *Skinner v. Railway Labor Executives' Assn.*, 489 U.S. 602, 619, 109 S.Ct. 1402, 1414, 103 L.Ed.2d 639 (1989) (quoting *Delaware v. Prouse*, 440 U.S. 648, 654, 99 S.Ct. 1391, 1396, 59 L.Ed.2d 660 (1979)). This does not mean that whether a particular search is reasonable depends in each case upon an ad hoc balancing of factors. The Court's approach seems rather to be one of categorical balancing. Therefore, even were it not the case that "the border search exception to the Fourth Amendment's reasonableness requirement extends to exit searches," *ante*, at 1296, it would nonetheless remain true that the fact that a search was conducted of persons or things *exiting the country* must be relevant to the balance, for "the Fourth Amendment's balance of reasonableness is qualitatively different at the international border than in the

---

1. The "border search exception," even as applied to entry searches, is something of a misnomer insofar as it implies that border searches sit entirely outside the purview of the Fourth Amendment. Despite the "exception," the Fourth Amendment unquestionably imposes some limitations upon the scope and duration of an entry search, presumably through the qualifier "routine." *See United States v. Montoya de Hernandez*, 473 U.S. 531, 540–42, 105 S.Ct. 3304, 3310–11, 87 L.Ed.2d 381 (1985). Because it does, Judge Kozinski has argued that exit searches of checked airline baggage conducted outside the presence of the traveller and without notice to the traveller before and after the search should be deemed unreasonable even if the border search exception does extend to exit searches. *See United States v. Nates*, 831 F.2d 860, 863–68 (9th Cir.1987) (Kozinski, J., dissenting). I do not understand the majority to resolve the question whether *suspicionless* searches conducted in such a manner might yet violate the Fourth Amendment. Quite properly, the majority does not purport to elucidate the extent to which the qualifier "routine" would operate as an ultimate limitation on exit searches.

interior." *United States v. Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3309. I would hold that, under the highly context-dependent ordinary standards of Fourth Amendment jurisprudence, the two searches here at issue were reasonable independently of the question whether the border search exception ought to extend to exit searches.[2]

The fact that a particular search occurs as a person or her effects are leaving the country bears relevance to Fourth Amendment analysis in at least two ways. First, the government's need to apprehend the traveller *before* the crime is completed is particularly great when the completion of the crime necessarily will occur beyond the nation's territorial jurisdiction. Because investigation of the crime and apprehension of the perpetrator are likely to be especially difficult in cases of illegal export, law enforcement efforts must naturally focus more heavily on crime prevention. Second, travellers (or exporters) undoubtedly have a lesser expectation of privacy when they (or their goods) leave the country; *see, e.g., United States v. Stanley,* 545 F.2d 661, 667 (9th Cir.1976), *cert. denied,* 436 U.S. 917, 98 S.Ct. 2261, 56 L.Ed.2d 757 (1978), if for no other reason than that the departure from the United States is almost invariably followed by an entry into another country which will likely conduct its own border search. For these reasons, I have no doubt that the usually requisite degree of suspicion—probable cause—ought not to govern exit searches. Exit searches ought to be constitutionally "reasonable" so long as the government agent has an objectively reasonable suspicion that a search of the person or property in question would reveal a violation of the law.

### A.

Customs agents opened Oriakhi's shipping container because it was bound for a narcotics source country and was accompanied by vague and incomplete documentation which conspicuously omitted the names of a shipper or a consignee. The agents had the requisite reasonable suspicion. What they did not have was a warrant. But they did not need one. As the majority notes, *ante,* at 1295 n. 1, the New Jersey container search was conducted pursuant to customs officers' duty to enforce the criminal laws regulating currency export. Consequently, the search was not a regulatory inspection directed to discovering health or safety violations but, rather, one undertaken for traditional law enforcement purposes. Because the Fourth Amendment itself directs that "no Warrant shall issue, but upon probable cause," the Supreme Court has held that, at least outside of the administrative search context, the constitution does not require a warrant when the degree of suspicion necessary to make a search is less than probable cause. *Griffin v. Wisconsin,* 483 U.S. 868, 877–78, 107 S.Ct. 3164, 3170–71, 97 L.Ed.2d 709 (1987). Consequently, as an exit search supported by reasonable suspicion, the New Jersey container search passed Fourth Amendment muster even though conducted without a warrant and without any need to invoke the border search exception.

### B.

The search of Oriakhi's luggage at JFK airport was also constitutionally reasonable, though for somewhat different reasons. The crucial fact here is that customs agents x-rayed Oriakhi's luggage before they opened

---

**2.** One of the five circuits that the majority says have extended the border search exception to exit searches is better understood to have engaged in exactly this balancing approach. In *United States v. Hernandez–Salazar,* the Eleventh Circuit explicitly engaged in a balancing analysis en route to concluding that "Congress may, consistent with the fourth amendment, authorize customs officers to conduct warrantless searches of persons and property departing the United States on the basis of reasonable suspicion that a currency reporting violation is occurring." 813 F.2d at 1138. The court's caveat that it "need not decide here whether the 'border search ex-

ception' applies equally in all respects to incoming and outgoing searches at the border," *id.,* reveals, I believe, that the court did not actually extend the border search exception to exit searches (for, if it had, it could not have avoided deciding the question that it purports not to decide), but rather considered the fact that the search took place at the border as part of a totality of circumstances balancing approach. *See id.* at 1139 ("Balancing these considerations leads us to conclude that section 5317(b) does not authorize unreasonable searches and seizures.").

it or, for that matter, before they engaged in any other search or seizure. We already have held that the examination of a closed container by means of an x-ray scanner ordinarily constitutes a search, but that x-ray searches of air travellers' persons and of their carry-on luggage are not "unreasonable" within the meaning of the Fourth Amendment. *United States v. Haynie,* 637 F.2d 227, 230–31 (4th Cir.1980). Similarly, I would hold that, in light of contemporary societal experience with terrorist activity (such as, preeminently, the Lockerbie bombing), society would not recognize as objectively reasonable, *see Katz v. United States,* 389 U.S. 347, 361, 88 S.Ct. 507, 516–17, 19 L.Ed.2d 576 (Harlan, J., concurring), a passenger's expectation that her checked baggage would not be x-rayed before it is loaded onto an airplane, particularly one departing on an international flight. Therefore, the x-raying of Oriakhi's checked luggage did not infringe upon a protected privacy interest and so did not violate the Fourth Amendment.

Of course, once the x-ray revealed firearms and ammunition, customs agents had probable cause to suspect that a crime was being committed. *See* 18 U.S.C. § 922(e) (making it unlawful to deliver to a common carrier a package containing a firearm or ammunition without providing written notice to the carrier); 14 CFR § 129.27(b) (prohibiting passengers of foreign air carriers from checking luggage containing a dangerous weapon without first informing airline). Because the luggage was about to be loaded onto the plane and because the plane, with Oriakhi aboard, was preparing to depart, the exigency of the circumstances, *see, e.g., Carroll v. United States,* 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 (1925), permitted airport customs agents to open Oriakhi's luggage and to search its contents without first securing a warrant (even assuming one would otherwise be required). Therefore, under settled Fourth Amendment principles, the searches at JFK, like the search in New Jersey, did not violate Oriakhi's rights under the Fourth Amendment without regard to whether the border search exception applies to exit searches.

## II.

Because Oriakhi's challenge to the New Jersey and New York exit searches should be rejected regardless whether the border search exception applies to exit searches, I believe that we need not reach the more profound constitutional question whether government agents may conduct "routine" searches of all persons and effects exiting the country even absent any degree of particularized suspicion. Nonetheless, it might be appropriate to reach that question if it were an open-and-shut one that should be decided now simply to provide circuit precedent on an important question of first impression. For the reasons that briefly follow, I do not think the question is nearly as clear-cut as does the majority and therefore I would reserve it for a case in which its resolution *is* strictly necessary.

First, I believe the majority understates the case in observing that "the Supreme Court has not yet ruled directly on the question of whether the border search exception to the Fourth Amendment applies to persons leaving the country." *Ante,* at 1295–96 n. 4. The Court has simply not ruled on that question directly or otherwise. As a chambers opinion, *Julian v. United States,* 463 U.S. 1308, 103 S.Ct. 3522, 77 L.Ed.2d 1290 (1983), reflects, of course, the view of only a single Member of the Court. And the dicta in *Shultz* that supports the majority's conclusion is counterbalanced by contrasting language from other Supreme Court decisions. *See United States v. Ramsey,* 431 U.S. at 619, 97 S.Ct. at 1980 ("Border searches, then, from before the adoption of the Fourth Amendment, have been considered to be 'reasonable' by the single fact that the person or item in question had *entered into our country from outside.*") (emphasis added); *Montoya de Hernandez,* 473 U.S. at 538, 105 S.Ct. at 3309 ("Routine searches of the persons and effects of *entrants* are not subject to any requirement of reasonable suspicion, probable cause, or warrant, and first-class mail may be opened without a warrant on less than probable cause, *Ramsey, supra.*") (emphasis added).

Second and most important, the Supreme Court decisions that recognized the border search exception do not by their own logic apply to exit searches. In *Ramsey,* "the

principal case articulating the border search exception," *ante*, at 1295, the Supreme Court advanced two justifications for the rule that the government may, consistent with the Fourth Amendment, search persons and property entering the country without any degree of heightened suspicion. In addition to citing considerations " 'of national self protection reasonably requiring one entering the country to identify himself as entitled to come in, and his belongings as effects which may be lawfully brought in,' " *Id.* at 618, 97 S.Ct. at 1979 (quoting *Carroll v. United States, supra,* 267 U.S. at 154, 45 S.Ct. at 285), the Court emphasized that such searches enjoyed a distinguished historical pedigree. In particular, the Court noted that the first customs statute, enacted in July 1789, granted customs officials plenary power to search incoming vessels without a warrant. " 'As this act was passed by the same Congress which proposed for adoption the original amendments to the Constitution, it is clear that the members of that body did not regard searches and seizures of this kind as "unreasonable," and they are not embraced within the prohibition of the amendment.' " 431 U.S. at 617, 97 S.Ct. at 1979 (quoting *Boyd v. United States,* 116 U.S. 616, 623, 6 S.Ct. 524, 528, 29 L.Ed. 746 (1886)). Therefore, the majority's contention that "[t]he rationale for exempting border searches from the Fourth Amendment's probable cause and warrant requirements rests on fundamental principles of national sovereignty, which apply equally to exit and entry searches," *ante,* at 1302, is missing an essential qualification. More accurately, the border search exception rests in part, and only in part, on fundamental principles of national sovereignty. It rests as well on a long-standing history of suspicionless warrantless entry searches. Absent any evidence of 18th century precedent for suspicionless warrantless *exit* searches, it simply is not true, as the majority asserts, *ante* at 1297–98 (emphasis added), that the "*principles* articulated in" *Ramsey* justify application of the border search exception to exit searches.[3]

Third, there is reason to doubt that the principle upon which the majority does exclusively rely—the long-standing right of the sovereign to protect itself—can shoulder the analytical burden assigned it. Because that principle is at least potentially implicated every time the government might wish to engage in a search, a more persuasive analysis is required to explain why that principle justifies placing exit searches within an "exception" to the Fourth Amendment. It is by no means self-evident either that the harm caused by illegal currency export is of extraordinary magnitude or that, in order to combat that harm, there is a compelling need for the sovereign to be able to conduct "routine" suspicionless searches of all persons and property leaving the country.[4]

Because we need not decide the weighty and difficult constitutional issue whether we and all our personal effects may be subjected to "routine" searches by the Government, without any particularized suspicion, possibly including searches of our effects outside our presence and without any advance notice, whenever we take a trip across our borders, I would not do so. That decision should await a case where it is flatly unavoidable.

---

3. In other words, there simply is not support for the assertion, *ante,* at 1297, that all routine border searches—not just entry searches—have "always been excepted from the requirements of the Fourth Amendment."

4. Tellingly, the circuits which have extended the border search exception to exit searches have done so in cases where government agents almost certainly had reasonable suspicion to conduct the subsequently challenged search. *See United States v. Ezeiruaku,* 936 F.2d 136, 138 (3d Cir.1991); *United States v. Udofot,* 711 F.2d 831, 833–34 (8th Cir.), *cert. denied,* 464 U.S. 896, 104 S.Ct. 245, 78 L.Ed.2d 234 (1983); *United States v. Swarovski,* 592 F.2d 131 (2d Cir.1979) (regarding constitutionality of search described in *United States v. Swarovski,* 557 F.2d 40, 41–43 (2d Cir.1977)); *United States v. Stanley, supra,* 545 F.2d at 663–64 (9th Cir.1976); *id.* at 667 (Kilkenny, J., concurring); *see also Hernandez–Salazar,* 813 F.2d at 1138 (emphasizing that "searches for section 5316 violations on less than reasonable suspicion remain unlawful"); *id.* at 1139–40 (Hatchett, J., concurring in part and dissenting in part) (disputing the majority's conclusion that reasonable suspicion supported the search at issue and therefore concluding that the search was unconstitutional).