UNITED STATES of America, Plaintiff,

v.

Anthony Joseph SORAPURU, Jr., a/k/a "Allen Shepard" a/k/a "Whitney Green" a/k/a "Anthony Green" Kirk Bovie, Gina Bramlett, a/k/a "Gina Branlett" Talanda Young, Jason Nicholson, and Jerry Thomas, Defendants.

No. 95–CR–87–S.

United States District Court, D. Colorado.

Oct. 16, 1995.

Kathleen Tafoya, Asst. U.S. Atty., Washington, DC, for plaintiff.

Harvey Steinberg, Thomas P. Johnson, Peter Bornstein, Nathan Chambers, Jeralyn Merritt, Boston Stanton, Jr., Irving Andrews, Denver, CO, for defendants.

## MEMORANDUM OPINION AND ORDER

SPARR, District Judge.

THIS MATTER comes before the court on: (1) Defendant Sorapuru's Motion to Suppress Intercepted Wire Communications, filed July 31, 1995 and joined in and adopted by Defendant Bovie on September 21, 1995; (2) Defendant Nicholson's Motion to Suppress Evidence Obtained from Wiretaps, filed July 31, 1995 and joined in and adopted by Defendant Bovie on September 21, 1995 and by Defendant Thomas on September 27, 1995; and (3) Defendant Campbell's Motion to Suppress Interceptions of Wire Communications, filed July 28, 1995 and joined in and adopted by Defendant Bovie on September 21, 1995. Defendants Bramlett and Young generally seek to join in and adopt all of their Co–Defendants' motions. The court has reviewed the motions, the Government's responses, the entire case file, the exhibits, the evidence and arguments presented at the hearing held October 5, 1995 and October 6, 1995, and the applicable law and is fully advised in the premises.

The Defendants contend that the evidence obtained from the wiretaps must be suppressed for various reasons: (1) the authorization order signed by Judge Babcock was facially insufficient; (2) each Defendant was not specifically named as a conspirator in the application for authorization of a wiretap; (3)

the application for authorization of a wiretap did not meet the necessity requirement of 18 U.S.C. § 2518(1)(c); (4) the application for authorization of a wiretap was insufficient and was not supported by probable cause as required by 18 U.S.C. § 2518(3); (5) the minimization requirements of 18 U.S.C. § 2518(5) were not met; and (6) the original tape recordings were not timely sealed as required by 18 U.S.C. § 2518(8)(a).

### 1. Standard of Review

■■■ A wiretap authorization order is presumed proper and the Defendants have the burden of overcoming that presumption. *United States v. Mondragon,* 52 F.3d 291, 292 (10th Cir.1995), citing *United States v. Nunez,* 877 F.2d 1470, 1472 (10th Cir.), *cert. denied* 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989). The Defendants must come forward with a *prima facie* showing that the wiretap was conducted pursuant to an illegal order. *United States v. Bennett,* 825 F.Supp. 1512, 1518 (D.Colo.1993) (citations omitted). Not every failure to comply with any requirement provided in the federal wiretap statute renders the interception of wire or oral communications unlawful. *Id.* The Defendants must not only demonstrate a deviation from the requirements of the wiretap statute, but this deviation must be substantial. *Id.*

### 2. Facial Sufficiency of Wiretap Order

■ The federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2521 (1993 & Supp.1995), establishes a three-tiered procedure for obtaining authorization to intercept wire or oral communications. Strict adherence to these procedural steps is a prerequisite to issuance of a wiretap order. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1990). First, a duly authorized law enforcement officer must obtain approval from the United States Attorney General or a specifically designated Assistant Attorney General in order to apply to a federal judge for a wiretap. 18 U.S.C. § 2516(1). Second, once such approval is obtained, the officer must present to the judge a written application for a wiretap. 18 U.S.C. § 2516(1), (3). Third, the judge must make certain enumerated findings and issue an *ex parte* order containing specified elements. 18 U.S.C. § 2516(1), (3), § 2518(1), (3), (4).

The wiretap order in this case contains findings which reflect the precise statutory language of 2518(3). The application and accompanying affidavit contain all the information required by § 2518(1). The wiretap order therefore complies with the requirements set forth in § 2518(3) and is facially sufficient.

### 3. Identification Requirement of 18 U.S.C. § 2518(4)

■ Title III requires the naming of a person in the application or interception order only when law enforcement authorities have probable cause to believe that the individual is committing the offense for which the wiretap is sought. 18 U.S.C. § 2518(4); *Bennett,* 825 F.Supp. at 1521–22. The wiretap application must name an individual if the Government has probable cause to believe that the individual is engaged in the criminal activity under investigation and expects to intercept the individual's conversations over the target telephone. *United States v. Donovan,* 429 U.S. 413, 428, 97 S.Ct. 658, 668, 50 L.Ed.2d 652 (1977). The Government has no duty to establish probable cause as to each interceptee—rather, it is sufficient that there is probable cause to tap the phone. *Nunez,* 877 F.2d at 1472 n. 1 (citation omitted); *United States v. Diltz,* 622 F.2d 476, 483 (10th Cir.1980). The failure to identify additional persons who are likely to be overheard engaging in incriminating conversations does not invalidate an otherwise proper judicial authorization for a wiretap. *Donovan,* 429 U.S. at 433–34, 97 S.Ct. at 671.

■ Here, Defendants Campbell, Sorapuru, and Anderson were extensively named in the affidavit and the wiretap order. Defendant Bramlett was extensively named in the affidavit and was identified in the order as the subscriber to two of the target telephones. Defendants Thomas and Nicholson were named in the affidavit supporting the application as subscribers to call-back numbers that appeared in connection with a digi-

tal display paging device number subscribed to by Alan Shepard, an alias alleged to be used by Anthony Sorapuru. Because nothing more was known at that time about these two Defendants, sufficient probable cause did not exist to require that these Defendants be named in the wiretap order. *Diltz,* 622 F.2d at 482–83. Defendant Bovie's identity was apparently learned incidental to the wiretap. The wiretap order in this case fulfilled the requirement of § 2518(4) of identifying the individuals believed to be committing the offense for which the wiretaps were sought. The wiretap order was not invalidated by the failure to identify each and every Defendant.

*4. Necessity for Wiretaps*

An application for a wiretap authorization must meet the "necessity" requirement set forth in 18 U.S.C. § 2518 as follows:

> (1) Each application for an order authorizing or approving the interception of a wire, oral, or electronic communication under this chapter shall be made in writing upon oath or affirmation to a judge of competent jurisdiction and shall ... include the following information:
>
> ... (c) a full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous;
> ...

■ The purpose of the necessity requirement is to ensure that wiretaps are not routinely employed as the first step in criminal investigation. *Giordano,* 416 U.S. at 515, 94 S.Ct. at 1826–27. The statute does not require that the Government exhaust every conceivable method of investigation before obtaining a wiretap. *United States v. Armendariz,* 922 F.2d 602, 607 (10th Cir.1990) (citation omitted); *Nunez,* 877 F.2d at 1472 (citations omitted); *United States v. Apodaca,* 820 F.2d 348, 350 (10th Cir.), *cert. denied* 484 U.S. 903, 108 S.Ct. 245, 98 L.Ed.2d 202 (1987).

■ The Government's burden of showing that other procedures reasonably appear unlikely to succeed or that they are too dangerous to use is not great—substan-

tial compliance with the statute is all that is required. *Bennett,* 825 F.Supp. at 1525 (citations omitted). In determining whether the Government has substantially complied with the necessity requirement, it is appropriate to look both to the applications and the affidavits submitted with them. *Id.*

■ The necessity requirement should be read in a common sense fashion to realize the congressional purpose of granting some investigative discretion. *United States v. Oriakhi,* 57 F.3d 1290, 1298 (4th Cir.1995), *petition for cert. filed* (U.S. Sept. 25, 1995); *Nunez,* 877 F.2d at 1472; *See Armendariz,* 922 F.2d at 607. Sufficient justifications for the use of electronic surveillance include the identification of all the members of a conspiracy, learning the precise nature and scope of the illegal activity, the apprehension of accomplices, and the determination of the dimensions of an extensive conspiracy. *United States v. Mesa–Rincon,* 911 F.2d 1433, 1443 (10th Cir.1990). Necessity is demonstrated where normal investigative techniques employing a normal amount of resources have failed to make the case within a reasonable period of time. *United States v. Bailey,* 607 F.2d 237, 242 (9th Cir.1979), *cert. denied* 445 U.S. 934, 100 S.Ct. 1327, 63 L.Ed.2d 769 (1980). The Government must base its need on real facts and must specifically describe how it has encountered difficulties in penetrating the criminal enterprise or in gathering evidence with normal techniques to the point where wiretapping becomes reasonable. *Oriakhi,* 57 F.3d at 1298 (citations omitted). Where the objective is to discover the full scope of a drug operation—suppliers, major buyers, or satellite conspirators—the necessity requirement is met if normal investigative procedures have not succeeded in developing evidence against all members of the narcotics conspiracy. *United States v. Torres,* 908 F.2d 1417, 1422 (9th Cir.), *cert. denied* 498 U.S. 948, 111 S.Ct. 366, 112 L.Ed.2d 329 (1990).

■ In this case, Special Agent Wilcox's 87–page affidavit in support of the Application for Interception of Wire Communications specifically detailed the Government's numerous investigation efforts. (See Sorapuru's Appendix to Motion to Suppress In-

tercepted Wire Communications, Exhibit C). The affidavit demonstrates that, during the preceding three and one-half years, normal investigative techniques had not succeeded in revealing the full scope of the drug organization or developing evidence against all of the suppliers and main customers and distributors. The affidavit identified and described numerous shortcomings in traditional techniques to attain the investigators' goals.

Because the primary targets of the investigation made a practice of insulating themselves from the actual distribution and acquisition of the drugs by using other individuals to conduct most of the actual delivery and distribution of the drugs, law enforcement was unable to make direct contact with them. Physical surveillance of the suspects could not uncover the full scope of the conspiracy. In 1994, Anderson and Sorapuru closed down their front business, Hardbodies Paint and Body Shop, because they felt the police were watching them.

The usefulness of confidential sources was limited. The confidential sources were able to personally make only two purchase of crack cocaine from one of the primary suspects. Although one confidential source was offered an opportunity to purchase six kilograms of cocaine (the Defendants argue that the Government should have pursued this option), the reasonableness of the investigators' decision to forego this option cannot seriously be questioned. The confidential sources lacked significant information regarding the inner workings of the organization. The confidential sources were unable to introduce any undercover law enforcement officers to make drug purchases from any members of the conspiracy. The confidential sources were fearful of reprisal from members of the conspiracy. There was information that a prosecution against Defendant Campbell had been dropped after a confidential informant was found murdered.

The usefulness of participants-turned-informants was limited. The informant witnesses who were arrested for their own illegal conduct were lower-level players involved in transporting drugs and money between Denver and Los Angeles, but they lacked significant information regarding the conspir-

acy. Some of the informants were serving prison sentences and thus were unavailable to do undercover work. Some of the informants were reluctant to cooperate. The Government did not trust all of the information afforded by the informants. The informants included convicted drug dealers who would be vulnerable to impeachment at trial. Had the Government called them before the grand jury to testify, they would likely have invoked their Fifth Amendment privilege not to testify. Members of the conspiracy knew of certain arrests and an extensive grand jury investigation would have further alerted the co-conspirators. As the evidence at the hearing demonstrated, even with the arrests that were made, the Government had at best discovered the nature of "one branch of the tree," but had not obtained evidence against all of the members of the conspiracy.

Search warrants would have been helpful only to extent that the officers knew where to search and could establish probable cause for a warrant. One of the primary suspects had several residences and was believed to keep drugs at other locations known as "stash houses." Search warrants would have been of little use against persons not present at the time of the search or persons not easily traced to the property. Search warrants would have jeopardized the investigation before the completion of its objectives.

While clone pager, pen register, trap and trace, and toll information was gathered and analyzed extensively, those techniques could not reveal the identities of the parties or the content of the calls. The true identity of the subscriber was sometimes difficult to ascertain because the suspects used aliases or used other people as fronts when obtaining pagers or phones.

Based on the showing made in the affidavit and at the hearing, the court concludes that the necessity requirement of 18 U.S.C. § 2518(1)(c) was met. Normal investigative techniques had reached a standstill in penetrating the tightly woven, closely guarded cocaine distribution organization. Although other investigative measures had been utilized, albeit with some success as to lower level and peripheral conspirators, there was a genuine need for more information regard-

ing the scope of the conspiracy. Accordingly, the court finds and concludes that the evidence sufficiently demonstrates the necessity of the wiretaps.

### 5. Probable Cause for the Wiretap Order

The probable cause required for the issuance of a wiretap order is the same as that which is necessary to obtain the issuance of a warrant for a physical search. *Armendariz,* 922 F.2d at 608 (citation omitted). Probable cause is established from the totality of the circumstances. *Nunez,* 877 F.2d at 1472, citing *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983). Probable cause is a common-sense standard that requires facts sufficient to warrant a man of reasonable caution in the belief that an offense has been or is being committed. *Mesa–Rincon,* 911 F.2d at 1439.

The court's review of the evidence presented at the hearing and the affidavit supporting the application reveals ample probable cause for the wiretap order. Based on the allegations contained in the affidavit, the court finds that there was sufficient probable cause to believe an ongoing conspiracy existed to distribute cocaine by the use of the targeted telephones. Therefore, sufficient probable cause existed for the wiretap order.

### 6. Minimization

Minimization is required by 18 U.S.C. § 2518(5) which provides that "every order and extension thereof ... shall be conducted in such a way as to minimize the interception of communications not otherwise subject to interception." Minimization must be objectively reasonable under the circumstances to withstand scrutiny. *Scott v. United States,* 436 U.S. 128, 137–38, 98 S.Ct. 1717, 1723–24, 56 L.Ed.2d 168 (1978). Reasonableness must be determined from the facts of each case. *United States v. Earls,* 42 F.3d 1321, 1325 (10th Cir.1994) (citation omitted), *cert. denied* — U.S. ——, 115 S.Ct. 1800, 131 L.Ed.2d 727 (1995); *United States v. Willis,* 890 F.2d 1099, 1101 (10th Cir.1989) (citation omitted).

The starting point for review of the adequacy of minimization efforts is an examination of the reasonableness of the agents' efforts to refrain from monitoring conversations deemed nonpertinent to the investigation. *Willis,* 890 F.2d at 1101 (citations omitted). The factors to be considered in determining whether minimization was reasonable are: (1) the nature and scope of the criminal enterprise under investigation; (2) the Government's reasonable inference of the character of a conversation from the parties to it; and (3) the extent of judicial supervision. *Bennett,* 825 F.Supp. at 1529 (citations omitted).

The mere interception of calls unrelated to the drug conspiracy does not indicate a failure to meet the minimization requirement. *Earls,* 42 F.3d at 1325; *Torres,* 908 F.2d at 1423 (citation omitted). When the investigation is focusing on what is thought to be a widespread conspiracy, more extensive surveillance may be justified in an attempt to determine the precise scope of the enterprise. *Earls,* 42 F.3d at 1325, citing *Scott,* 436 U.S. at 140, 98 S.Ct. at 1724–25; *Bennett,* 825 F.Supp. at 1529 (citations omitted). It is recognized that monitors may need to listen for longer periods of time in the early stages of such investigations in order to determine the identity of speakers and the significance of conversations. *Willis,* 890 F.2d at 1102, citing *Scott,* 436 U.S. at 141, 98 S.Ct. at 1725. Likewise, where the suspects use a specialized code or jargon, a greater degree of monitoring is permissible. *Bennett,* 825 F.Supp. at 1529 (citations omitted).

In this case, the Government adopted reasonable procedures to ensure compliance with the minimization requirement. The monitoring agents were instructed on the requirements and need for minimization and were required to read minimization guidelines, including Judge Babcock's wiretap order. (*See* Plaintiff's Exhibit 1). Wilcox, the lead investigator, personally reviewed each tape and compiled reports that were filed with Judge Babcock once a week. (*See* Plaintiff's Exhibits 2, 3). The investigation was focused on a widespread conspiracy that resulted in a Second Superseding Indictment against ten individuals. The suspects

typically used code numbers and cryptic terminology in their telephone conversations.

During the wiretaps, 1,473 interceptions took place. If the court subtracts the 293 pertinent calls and the 417 incomplete (misdialed, hang-up, etc.) calls, neither of which is required to be minimized, it is left with 763 calls. *See Willis,* 890 F.2d at 1102. If the court further subtracts the calls deemed nonpertinent which lasted less than two minutes, as is appropriate under *Willis,* 890 F.2d at 1102 (citations omitted), it is left with one hundred nonpertinent calls which lasted more than two minutes. Of these one hundred nonpertinent calls which lasted over two minutes, the evidence shows that eighty eight calls were minimized, leaving twelve calls that were not minimized in compliance with § 2518(5). This amounts to a minimization success rate of 88%. The court concludes that the Government has sufficiently demonstrated that the wiretaps were properly minimized within the requirements of § 2518(5).

 Once the Government has made a prima facie showing of reasonable minimization, the burden then shifts to the Defendants to show more effective minimization could have taken place. *Willis,* 890 F.2d at 1102 (citation omitted). The Defendants first point to the twelve calls that did not strictly comply with the minimization requirement of § 2518(5). However, several facts nonetheless support the reasonableness of the Government's minimization efforts: (1) the primary target of the investigation, Anthony Sorapuru, was one of the speakers on several of the twelve calls; (2) more than one of the twelve calls involved time spent on hold waiting for another person to come to the phone; (3) more than one of the twelve calls was only three minutes in duration; (4) more than one of the twelve calls included what appeared to be code words for drug transactions; and (5) more than one of the twelve calls required additional time to identify the speakers.

 The Defendants next point to four calls that were subject to "spot checks" as violative of the minimization requirement. (*See* Defendants' Exhibits A, B, and C). However, the wiretap order signed by Judge Babcock specifically authorized spot checks "to ensure that the conversation has not turned to criminal matters." (Government's Exhibit D, Order Authorizing the Interception of Wire Communications, p. 7). Intermittent spot-checking of minimized calls is a reasonable permissible technique to monitor calls that may at the outset appear to involve purely personal matters but later turn out to be drug related. *United States v. Ozar,* 50 F.3d 1440, 1448 (8th Cir.) (citations omitted), *cert. denied* —— U.S. ——, 116 S.Ct. 193, 133 L.Ed.2d 128, 1995 WL 509443 (1995); *United States v. Angiulo,* 847 F.2d 956, 979 (1st Cir.1988) (citations omitted), *cert. denied* 488 U.S. 928, 109 S.Ct. 314, 102 L.Ed.2d 332 (1988); *United States v. Hinton,* 543 F.2d 1002, 1012 (2d Cir.1976). Otherwise, persons engaging in criminal conversations could always avoid detection by first engaging in several minutes of innocuous conversation before discussing criminal matters. In addition, one of the spot checked calls occurred on the first day of the wiretap, when monitors were not yet familiar with the speakers' voices.

Despite the Defendants' arguments regarding the twelve calls that were not strictly minimized and the four calls that involved spot-checks, the court concludes that the interceptions in this case were reasonably minimized under the circumstances.

*7. Alleged Delay in Sealing*

 The Defendants argue that the tapes obtained from the wiretaps should be suppressed because they were not sealed immediately in accordance with 18 U.S.C. § 2518(8)(a). The determination of whether a delay was significant depends on the circumstances and is a question of fact. *Bennett,* 825 F.Supp. at 1527 (citation omitted).

 The evidence demonstrated that, due to the intervening weekend, Monday, March 6, 1995 was the first business day after the termination of the wiretaps at 7:00 p.m. on Friday, March 3, 1995. (*See* Plaintiff's Exhibit 4). The evidence showed that, at the request of Judge Babcock, the tapes were ordered sealed first thing on Monday morning rather than on Friday night, Saturday, or Sunday. The court finds and concludes that the tapes were timely sealed in accordance

with the requirements of 18 U.S.C. § 2518(8)(a).

Accordingly, IT IS ORDERED:

1. Defendant Sorapuru's Motion to Suppress Intercepted Wire Communications is DENIED.

2. Defendant Nicholson's Motion to Suppress Evidence Obtained from Wiretaps is DENIED.

3. Defendant Campbell's Motion to Suppress Interceptions of Wire Communications is DENIED.