**UNPUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

UNITED STATES OF AMERICA,
Plaintiff-Appellee,

v.                                                                No. 96-4578

WALTER A. SCHULTE,
Defendant-Appellant.

Appeal from the United States District Court
for the Western District of Virginia, at Roanoke.
James C. Turk, District Judge.
(CR-95-17)

Argued: December 1, 1997

Decided: February 24, 1998

Before WILKINS, NIEMEYER, and MICHAEL,
Circuit Judges.

_____

Affirmed by unpublished per curiam opinion.

_____

**COUNSEL**

**ARGUED:** Richard Louis Derrico, COPENHAVER, ELLETT &
CORNELISON, Roanoke, Virginia, for Appellant. Thomas Ernest
Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washing-
ton, D.C., for Appellee. **ON BRIEF:** Robert P. Crouch, Jr., United
States Attorney, Karen B. Peters, Assistant United States Attorney,
UNITED STATES DEPARTMENT OF JUSTICE, Washington,
D.C., for Appellee.

_____

Unpublished opinions are not binding precedent in this circuit. See Local Rule 36(c).

_____

**OPINION**

PER CURIAM:

A jury convicted Walter Schulte of conspiracy to transport stolen construction equipment in interstate commerce, in violation of 18 U.S.C. § 371, and three counts of knowingly transporting stolen property in interstate commerce, in violation of 18 U.S.C. § 2314. The district court sentenced Schulte to 46 months imprisonment and ordered him to pay $3,039 in restitution. On appeal, Schulte challenges both his conviction and sentence. We affirm.

I

Schulte argues first that there was insufficient evidence to convict him of conspiracy and of the three substantive counts, contending that he was not a party to any conspiracy and that he did not know that the equipment, which he was repossessing, was stolen.

Viewing the evidence in the light most favorable to the government, the government established at trial that Schulte worked as a repossessor ("repo man") for Capital City Commercial Services Corporation in Des Moines, Iowa, which was in the business of repossessing machinery for credit companies. Schulte reported to Roy Teel, who was the son-in-law of the company's owner, James Talbot. Teel was the government's principal witness at trial, testifying for the prosecution as part of a plea bargain. He directly implicated himself, as well as Talbot and Schulte, in the criminal conspiracy.

Teel testified that in the fall of 1993, Schulte proposed a plan to steal "suspicious" heavy machinery, often without serial numbers, that Schulte saw while he was on legitimate repossession assignments. Schulte suggested that he could sell the machines to Jack's Rent-A-Hoe in Stanhope, New Jersey, because, according to Schulte, Jack

2

Wilcock, the owner of the New Jersey firm, would"buy anything."
In October 1993, both Talbot and Teel approved Schulte's plan.

From November 1993 to January 1994, Schulte stole heavy construction equipment for Capital City from locations across the East Coast and Midwest. In total, he stole at least 13 tractors of various types, which the conspirators called "bounty units." In connection with the bounty units, Capital City sent Schulte no paperwork to authorize their "repossession." Rather, Schulte sent Teel a "bill" once the machines were stolen providing identifying information about the equipment. While bills submitted for legitimate repossessions usually included the debtor's name, the "bills" for the bounty units contained hash marks where the debtor's name ordinarily appeared. Schulte also arranged for the machines' transportation by tractor trailer either to Schulte's home in Rockaway, New Jersey, or to Jack's Rent-A-Hoe in Stanhope, New Jersey. On receipt of the bills, Teel prepared bills of sale for the machines to document their sale to Jack's Rent-A-Hoe. Schulte received a minimum of $1,000 plus expenses for each piece of machinery stolen, and the remaining proceeds were divided evenly between Talbot and Teel.

The three specific thefts for which Schulte was convicted took place on January 13-14 and January 23, 1994. During the evening of January 13-14, Schulte stole a backhoe owned by Maughan Construction Company, that he found near Richmond, Virginia, and a backhoe owned by Richardson-Wayland Construction Company, that he found near Lynchburg, Virginia. Both machines were loaded onto a tractor trailer owned and operated by John Hartman and James Slavik, who transported them to Schulte's home in New Jersey. Teel testified that these two thefts had been authorized by Talbot who subsequently sold the machines to Jack's Rent-A-Hoe for $28,000.

On January 23, 1994, Schulte, Hartman, and Slavik returned to Virginia where they stole a backhoe from Baker Brothers that was located in a parking lot construction site near Roanoke. For documentation, Hartman purchased a bill of lading at a local truck stop and Schulte completed the form. Hartman and Slavik then transported the backhoe to Jack's Rent-A-Hoe in New Jersey, while Schulte departed for Ohio on another assignment. Teel testified that he had not authorized the theft of this particular piece of equipment and had ordered

3

Schulte to return it, but Schulte advised Teel that it was too late since the backhoe was already en route to Jack's Rent-A-Hoe. When Hartman and Slavik arrived at Jack's Rent-A-Hoe, Jack Wilcock refused to take delivery of the machine. He informed the two men that the two backhoes they had delivered earlier were stolen and that he suspected this machine also had been stolen. Several days later, the FBI executed a search warrant for the premises of Jack's Rent-A-Hoe and recovered all three backhoes along with other evidence of the conspiracy.

Schulte denied Teel's testimony and denied participating in the conspiracy, claiming that he never knew that the stolen machines were not subject to lawful repossession.

It is well established that we will not disturb a jury's verdict on appeal where there is substantial evidence, viewed in the light most favorable to the government, to support it. See Glasser v. United States, 315 U.S. 60, 80 (1942); United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). Because there was evidence both to convict and to acquit, we must reject Schulte's claim that the jury could not properly have found him guilty. The jury obviously believed Teel's testimony and discredited Schulte's.

II

Schulte's second assignment of error on appeal is his contention that he was unfairly prejudiced by the introduction of character evidence during the government's cross-examination of him. Specifically, Schulte challenges the government's questioning concerning whether Schulte had ever "engaged in a little breaking and entering" while repossessing vehicles, whether he had filed his 1992 and 1993 tax returns, whether he had lied on a gun permit and on his financial affidavit for court-appointed counsel, and whether he had attempted to cooperate with law enforcement officers prior to and after his indictment.

The government argues that Schulte's credibility was an important issue in this case and that when Schulte testified, denying participation in the conspiracy, he placed his credibility at issue. Moreover, the government argues, Schulte's direct testimony "opened the door" to

many of the government's questions on cross-examination. We believe that the court did not abuse its discretion in allowing the government to challenge Schulte's credibility.

With respect to questions about Schulte's attempts to contact law enforcement officers, the district court sustained Schulte's objection when the government asked him if he had attempted to contact the FBI following his indictment. The court, however, permitted extensive questioning concerning Schulte's efforts to cooperate with federal and state police prior to his indictment. It was not an abuse of discretion for it to do so. Schulte had testified on direct examination that, prior to his arrest, he had attempted to contact both New Jersey state police and the FBI in order to clear his name. Notwithstanding Schulte's having opened up the subject for cross-examination, it is not improper for the government to use pre-arrest silence to impeach a testifying defendant's credibility at trial. See Jenkins v. Anderson, 447 U.S. 231, 238-40 (1980).

III

Schulte next contends that the district court erred in refusing to instruct the jury on the definition of "reasonable doubt." He argues that in the absence of a definition of reasonable doubt, the high burden imposed on the government in criminal trials is eroded toward a civil preponderance standard. The law in our circuit, however, is clear that a district court "should not attempt to define the term `reasonable doubt' in a jury instruction absent a specific request for such a definition from the jury." United States v. Oriakhi , 57 F.3d 1290, 1300 (4th Cir. 1995); see also United States v. Ricks, 882 F.2d 885, 894 (4th Cir. 1989). Schulte does not claim that the jury in this case requested such a definition, and accordingly it was not an abuse of the district court's discretion to reject Schulte's request.

IV

Finally, Schulte challenges various aspects of his sentencing. He contends, first, that the amount of loss attributed to him for sentencing purposes was too high and that the district court should not have denied his request for a court-appointed appraiser to make an independent assessment of the value of the stolen machines. The district

5

court based its determination of the amount of loss on the presentence report which calculated the value of the stolen machines based on insurance and police reports provided by the FBI. Accordingly, the court's conclusion that the loss sustained was over $400,000 was supported by evidence and is not clearly erroneous. See United States v. Daughtrey, 874 F.2d 213, 217 (4th Cir. 1989). As for the court's refusal to appoint an independent appraiser, "[a] decision to deny, or grant, an application for expert services is a matter committed to the sound discretion of the district court and will not be disturbed on appeal absent a showing of prejudice." United States v. Sloan, 65 F.3d 861, 864 (4th Cir. 1995). The district court explained that, since only three of the thirteen stolen machines attributed to Schulte were available for inspection, an independent appraisal "would be of little or no value to the court." In these circumstances, we cannot conclude that the district court abused its discretion in denying Schulte's request for a court-appointed appraiser.

Schulte also argues that the district court erred in enhancing his sentence for (1) obstruction of justice, (2) more than minimal planning, and (3) his role in the offense. Again, we find no error. In support of its conclusion that Schulte obstructed justice, the court relied on its conclusion that Schulte both committed perjury and submitted false evidence at trial. Its conclusion that more than minimal planning was involved is also well supported by the record. The sentencing guidelines instruct that more than minimal planning is present in any case "involving repeated acts over a period of time, unless it is clear that each instance was purely opportune." U.S.S.G. § 1B1.1, comment. (n.1(f)). In this case, the criminal conspiracy involved identifying and stealing "bounty units" from isolated locations across the Midwest and the East Coast, arranging for their transportation to New Jersey, and creating false documentation for the stolen machines. Given the complicated nature of the scheme, we conclude that the district court did not clearly err in finding more than minimal planning. Finally, Schulte's role in the conspiracy as an organizer, leader, manager or supervisor, is well supported by the evidence. Schulte not only proposed the scheme, but also located and stole the machines, arranged for their transportation to New Jersey, and participated in their sale to Wilcock.

6

For the foregoing reasons, we affirm the judgment of the district court.

<u>AFFIRMED</u>

7