UNITED STATES of America,
Plaintiff,

v.

Juan Carlos BORRAYO–GUTIERREZ, a/k/a Carlos Borrayo, Jose Jesus Martinez, a/k/a Chuy, a/k/a Juan Rosario Gonzalez, Rafael De Leon–Gutierrez, a/k/a Rafa, a/k/a Fey, Cesar De Leon–Gutierrez, Nalvor Hector Ramirez, Gloria Ramirez–Encarnacion, Mary Ramirez, Pedro Trujillo–Valdez, Javier Lnu, a/k/a La Vaca, Robert Lee Abeyta, Mac Valdez, Kristi Lujan, Issac Lnu, a/k/a Aguado, Manuel Baltazar, Geovani Baltazar–Padilla, Pepino Lnu, [Hector Gutierrez Dias] Gabino Pelayo–Arciniega, Jorge Hernandez, a/k/a Perico, Jose Arechiga, a/k/a Gumaro, Jesus Lnu a/k/a Chuy, [Jesus Trujillo–Valdez] Cherie Lnu, [Sharon Contreras] Edward Rangel, Roberto Barajas–Martinez, Luis Alberto Andrade–Rosales, a/k/a Beto, Luis Pena–Arce, Defendants.

No. CRIM.A.00–CR–18–S.

United States District Court,
D. Colorado.

Oct. 26, 2000.

⚷516

MEMORANDUM OPINION
AND ORDER

SPARR, District Judge.

THIS MATTER came before the Court for hearing on August 7, 8, 9, and 10, 2000, on Defendant Rafael DeLeon–Gutierrez's Motion to Suppress Electronic Surveillance and Wiretap Evidence, July 13, 2000, Defendant Nalvor Hector Ramirez's Motion for Suppression of Wiretaps, filed July 6, 2000, Motion Challenging Authenticity of Wiretap Transcriptions, filed July 24, 2000, and Amended Motion for Suppression of Wiretaps, filed July 28, 2000, Defendant Gloria Ramirez–Encarnacion's Motion to Suppress Wiretap Evidence and Motion for a *Franks* Hearing, filed July 12, 2000, Defendant Mary Ramirez's Motion for Suppression of Wiretaps, filed July 6, 2000, Defendant Hector Gutierrez Dias' Motion to Suppress Wire Interceptions, filed June 29, 2000, Defendant Gabino Pelayo–Arciniega's Motion to Suppress Contents of Intercepted Conversations, filed June 30, 2000, Defendant Jesus Trujillo–Valdez's Motion to Suppress Contents of Intercepted Conversations, filed June 28, 2000, Defendant Sharon Contreras' Motion for Suppression of Evidence Based upon Wiretap, filed June 26, 2000, and Defendant Edward Rangel's Motion to Suppress Various Wire Interceptions and the Fruits Thereof, filed July 6, 2000.

The Court heard extensive evidence and arguments of counsel at the hearing. At the beginning of the hearing, on August 7, 2000, Defendant Mac Valdez's Motion to Join, filed July 24, 2000, and Motion to Join, filed July 27, 2000, were denied for lack of standing. Although it was not specifically stated at the hearing, Defen-

dant Robert Lee Abeyta's Motion to Join Specific Wiretaps Suppression Motions, filed July, 6, 2000, is Granted.[1]

In addition, Defendants were allowed to file written closing arguments on their wiretap motions. The closing arguments have been considered by the Court as containing Defendants' arguments on the wiretap issues, as set forth in the Court's August 10, 2000, Order.[2] With regard to the closing arguments, Defendant Jesus Trujillo–Valdez's Motion to Join and Adopt Co–Defendants' Brief and Arguments, filed August 25, 2000, and Defendant Rafael DeLeon–Gutierrez's Motion to Join and Adopt, filed September 1, 2000, are Granted.

### Standard of Review

 The review of wiretap orders entered pursuant to Title III is subject to the following standards:

A wiretap authorization order is presumed proper and the Defendants have the burden of overcoming that presumption. *United States v. Mondragon,* 52 F.3d 291, 292 (10th Cir.1995), *citing United States v. Nunez,* 877 F.2d 1470, 1472 (10th Cir.), cert. denied 493 U.S. 981, 110 S.Ct. 513, 107 L.Ed.2d 515 (1989). The Defendants must come forward with a *prima facie* showing that the wiretap was conducted pursuant to an illegal order. *United States v. Bennett,* 825 F.Supp. 1512, 1518 (D.Colo. 1993) (citations omitted). Not every failure to comply with any requirement provided in the federal wiretap statute renders the interception of wire or oral communications unlawful. *Id.* The Defendants must not only demonstrate a deviation from the requirements of the

wiretap statute, but this deviation must be substantial. *Id.*

The federal wiretap statute, Title III of the Omnibus Crime Control and Safe Streets Act of 1968, as amended, 18 U.S.C. §§ 2510–2521 (1993 & Supp. 1995), establishes a three-tiered procedure for obtaining authorization to intercept wire or oral communications. Strict adherence to these procedural steps is a prerequisite to issuance of a wiretap order. *United States v. Giordano,* 416 U.S. 505, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974). First, a duly authorized law enforcement officer must obtain approval from the United States Attorney General or a specifically designated Assistant Attorney General in order to apply to a federal judge for a wiretap. 18 U.S.C. §§ 2516(1). Second, once such approval is obtained, the officer must present to the judge a written application for a wiretap. 18 U.S.C. §§ 2516(1), (3). Third, the judge must make certain enumerated findings and issue an *ex parte* order containing specified elements. 18 U.S.C. §§ 2516(1), (3), §§ 2518(1), (3), (4).

*United States v. Sorapuru,* 902 F.Supp. 1322, 1326 (D.Colo.1995), *affirmed sub nom. United States v. Bovie,* 120 F.3d 271, 1997 WL 423114 (10th Cir.), cert. denied, 522 U.S. 1007, 118 S.Ct. 585, 139 L.Ed.2d 422 (1997).

The closing arguments filed by Defendants discuss the issues of Necessity and Minimization. One closing argument also discusses what is characterized as failure to make application upon oath or affirmation. These three subjects will be discussed in the order listed here.[3]

---

**1.** Defendant Geovani Baltazar–Padilla's Motion to Suppress Intercepted Wire Communications and Request for Leave to Amend, filed June 30, 2000 is moot as he was dismissed from this case on October 18, 2000.

**2.** "Furthermore, any matters not addressed in these filings need not be addressed by the Government in their responses and *will not be considered by the Court.*"

**3.** As the Court noted in an Order dated September 21, 2000, some Defendants included arguments pursuant to *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) in their closing arguments on the wiretap motions. As noted at that time, those arguments were dealt with in that Order.

## Necessity

There are three wiretap orders at issue in these motions. Two are orders entered on new applications, 99–WT–16 and 99–WT–17, while the third is an extension of 99–WT–16. As Defendants have not contested that a showing of probable cause was made in these wiretaps, the Court must start with the question of whether the Government demonstrated sufficient "necessity" under 18 U.S.C. § 2518 to support the issuance of the three wiretap orders.

 Under the necessity requirement, the Government must make a full and complete showing that the wiretap is necessary. The purpose of the necessity requirement is to ensure that wiretaps are not routinely used as the first step in a criminal investigation. *Giordano,* 416 U.S. at 515, 94 S.Ct. 1820. An application for wiretap authorization must contain a full and complete statement as to whether or not other investigative procedures have been tried and failed or why those other techniques reasonably appeared either to be unlikely to succeed if tried, or to be too dangerous to even try. § 2518(1)(c).

In *United States v. Castillo–Garcia,* 117 F.3d 1179 (10th Cir.1997), this Court issued five warrants under 18 U.S.C. § 2518. The Tenth Circuit Court of Appeals, on review of that case, stated:

> Title III contains a 'necessity' requirement—separate and distinct from its 'probable cause' requirement—which must be satisfied before a wiretap order may be lawfully issued. The purpose of the 'necessity' requirement is "to ensure that the relatively intrusive device of wiretapping is not resorted to in situations where traditional investigative techniques would suffice to expose the crime."

*Castillo Garcia,* 117 F.3d at 1185 (quoting *United States v. Edwards,* 69 F.3d 419, 429 (10th Cir.1995), *cert. denied* 517 U.S. 1243, 116 S.Ct. 2497, 135 L.Ed.2d 189 (1996)) (other citations omitted).

A district judge must independently determine that the requested wiretap is necessary before he issues the wiretap order. *United States v. Mondragon,* 52 F.3d 291, 293 (10th Cir.1995). The judge must be convinced that the mandate of the statute has been met. The necessity requirement should be read in a common sense fashion to realize the congressional purpose of granting investigative discretion. *Sorapuru,* 902 F.Supp. at 1327.

If the application fails to meet the necessity requirement, a wiretap order may not issue. It is clear that any evidence obtained in violation of 18 U.S.C. § 2518(1)(c) must be suppressed. "Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding . . . if the disclosure of that information would be in violation of this chapter." 18 U.S.C. § 2515.

A review of the legislative history discloses that the Ninetieth Congress, which enacted Title III, envisioned normal investigative procedures would "include, for example, standard visual and aural surveillance techniques by law enforcement officers, general questioning or interrogation under an immunity grant, use of regular search warrants, and the infiltration of conspiratorial groups by undercover agents or informants." *Castillo Garcia,* 117 F.3d at 1186 (quoting Senate Comm. on the Judiciary, Report on the Omnibus Crime Control and Safe Streets Act of 1968, S.Rep. No. 90–1097, at 79 (1968), U.S.C.C.A.N. 2112 (1968)). The Committee Report also noted that "merely because a normal investigative technique is theoretically possible, it does not follow that it is likely." *Id.*

The Report further emphasized that the necessity showing must be tested in "a practical and commonsense fashion." *Castillo Garcia,* 117 F.3d at 1187. This means that a court must consider all the facts and circumstances to determine whether a sufficient showing of necessity has been made to justify the wiretap.

■ As the Tenth Circuit has repeatedly held, the necessity requirement of Title III should not be examined as if it were an exhaustion requirement.[4] "In examining necessity challenges to wiretap orders, we have repeatedly held that law enforcement officers are not required to exhaust all other conceivable investigative procedures before resorting to wiretapping." *Edwards*, 69 F.3d at 429, quoted in *Castillo Garcia*, 117 F.3d at 1187. This means that the Government need not try any other methods of investigation as long as it can demonstrate that normal investigatory techniques reasonably appear to be unlikely to succeed if tried or to be too dangerous to try. *See* 18 U.S.C. §§ 2518(1)(c), 2518(3)(c), *United States v. Mesa–Rincon*, 911 F.2d 1433, 1444 (10th Cir.1990).

■ The Tenth Circuit has set out a specific requirement that the wiretap application must include a full explanation of the investigative techniques that have been tried against the target of the wiretap. *Castillo Garcia*, 117 F.3d at 1187. In addition, the Government must thoroughly explain why any untried techniques would be either unsuccessful or too dangerous.

In addition to the explanation regarding surveillance, interrogation of witnesses or participants, search warrants, and use of undercover agents or informants, the application must also address the use of other normal investigative techniques such as pen registers and trap and trace devices. If those have not been tried, a similar explanation must be offered as to why they also would be unsuccessful or too dangerous. While the Tenth Circuit has repeatedly emphasized that the Government need not exhaust or explain its failure to exhaust every conceivable investigative procedure before resorting to a wiretap, unless the Government can show that trap and trace devices and pen registers would be ineffective or dangerous, they must be tried before resorting to wiretaps. *Castillo–Garcia*, 117 F.3d at 1187–88.

As previously noted, in *United States v. Bovie*, 120 F.3d 271, 1997 WL 423114 (10th Cir.), the Tenth Circuit addressed this Court's order in *United States v. Sorapuru*, 902 F.Supp. 1322 (D.Colo.1995), setting forth the same four main categories of investigative techniques that must be addressed. One of the arguments made by the Defendants in this case mirrors that presented by the defendant in *Bovie*. Like the Defendants here, Mr. Bovie argued that there was no need for a wiretap because "the FBI had met with 'nothing but success' with its use of traditional investigative methods." *Bovie*, 1997 WL 423114 at *2. Nevertheless, the Tenth Circuit analyzed the necessity issue pursuant to the statutory requirements set forth in *Castillo–Garcia*, 117 F.3d 1179 and *Sorapuru*, 902 F.Supp. 1322.

With these guidelines in mind, and after reviewing the Government's three applications for wiretaps, 99–WT–16, 99–WT–17 and the extension to 99–WT–16, and the affidavits of Drug Enforcement Administration Special Agent Lori A. Butler in support thereof, this Court holds that the Government's applications satisfy the requirements of 18 U.S.C. §§ 2518(1)(c) and (3)(c) respectively, for the following reasons.

### *Wiretap 99–WT–16:*

■ Special Agent Butler's affidavit explains in detail why normal investigative techniques which had been attempted failed to penetrate the organization which was involved in this alleged drug conspiracy. The affidavit also contains a separate section with a thorough review of the pen register and subscriber information analysis followed prior to requesting the wiretap. This section includes an explanation of the frequency of telephone calls between the target telephone number and eight other phone numbers, most of which were subscribed to by targets of this investigation. The affidavit points out that pen register analysis has made it possible to

---

4. Consequently, the Court rejects Defendant Mary Ramirez's argument that the Government has failed to exhaust. (Closing Arg. of Mary Ramirez at p. 3).

connect "some of the telephone calls made to and from the Target Telephone to criminal activity or persons who have engaged in criminal behavior." (Ex. D to Government's response to wiretap motions at ¶ 68). Nevertheless, it points out that the limits of pen register information make it advisable that the further step of a wiretap be used to gain additional information about the organization.

In setting forth the alternative investigative techniques attempted and the resulting need for interception, Special Agent Butler analyzed the normal investigative procedures which had been tried and had failed, or would be reasonably unlikely to succeed if tried, or were too dangerous to employ. It was conceded that there had been some success with some of the normal investigative procedures that had been tried but the evidence gained would only have allowed piecemeal prosecution of low level offenders. The affidavit makes it clear that the partial success did not go far in aiding the Government in identifying the full scope of the alleged conspiracy.

It is clear from a review of the affidavit that the limitations which were encountered by the FBI investigators answer the Defendants' contention that prior to the wiretap, the Government had sufficient information to file a case against some of the Defendants. While it may be true that the Government had some evidence against some of the Defendants prior to the request for the wiretap, it is clear that the Government did not have sufficient information based on their knowledge at the time of the request for the wiretaps to identify the full scope of the alleged conspiracy, its membership, suppliers, customers, and the methods and means utilized in accomplishing its ends.

*Confidential Sources/Undercover Agents*

The affidavit sets forth the use of confidential sources as well as cooperating witnesses. The latter included individuals who were actually involved in the purchase of drugs from targets of the investigation while the former included individuals such as Jess Grett, the dairy owner, who provided information but was apparently not involved in the illegal activities being investigated. The limitations in the usefulness of two cooperating witnesses is discussed as well as the inability to introduce an undercover agent into this "tight knit" group that had been in operation for six or more years. (Ex. D to Government's response at ¶ 75).[5]

An example of how a cooperating witness, with two years history of dealing with the group, had been unable to conduct direct purchases from a higher echelon participant is given to illustrate the difficulty of introducing even 'connected' outsiders to that level. Special Agent Butler also states in this section that while controlled deliveries had been considered, there had been no opportunities in which to conduct such a operation.

Defendants expend a great deal of effort on arguments on the issue of confidential sources and similar techniques. For example, several Defendants argue that the assistance from Jess Grett could have been used to a much greater extent and thus lessened the necessity for a wiretap. While Defendants may have a point that the Government probably had some power over Grett because of the situation regarding the immigration status of his employees, that fact does not mean that placing undercover agents in a vacant trailer on the dairy would have automatically yielded all kinds of material evidence against De-

---

5. Defendant Mary Ramirez argues that Special Agent Butler misled Judge Kane by discussing in paragraph 73 of Ex. D how 'the introduction of undercover agents... had met with minimal success' but Ramirez fails to point out that the statement is clarified in paragraph 75 where it is stated that the Government had been 'unable' to introduce an undercover agent into the group. Consequently, when the two paragraphs, which are on adjoining pages, are considered, there is no falsehood.

fendants. It does not seem unreasonable to assume that conspirators who are cautious enough to insulate themselves against known associates such as Emmett Grazier, with whom they had been dealing for two years, would react strongly to the introduction of a stranger into the middle of their working environment. Defendants' assumption that illegal activities would continue at full speed seems unrealistic at best. This is true whether the individual went to work at the dairy or just live in one of the trailers.[6]

Defendants also argue that the use of confidential sources gave the investigators sufficient information to arrest several of the Defendants at different times in the events at issue. There is no doubt that the use of confidential sources did give investigators such information but that fact does not solve two problems with Defendants' argument. The first is that the affidavit as a whole makes that fact clear to Judge Kane, or any reader. For example, pages 26 through 28 contain discussions of various witnesses and confidential sources and the information they provided about numerous parties, including some of these Defendants. Secondly, being able to arrest certain individuals on isolated charges of possession or distribution is a far cry from being able to bring conspiracy charges. It hardly warrants mentioning that the purpose of this investigation was to shut down the distribution network as a whole rather than just prosecute individuals on low level charges. Similarly, it is pure speculation that arresting any of these people would result in cooperation from them that would cause significant progress in the investigation. Consequently, the fact that information from

confidential sources gave the Government the ability to arrest certain people early in the investigation is less than convincing on the issue of necessity.

The Supplement to his motion to suppress filed by Defendant Pelayo–Arciniega also makes an argument regarding information received from confidential source Antonio Padilla in September 1999.[7] Defendant lists information about Defendant DeLeon–Gutierrez that was given to the DEA by Padilla and argues that this information shows the inaccuracy of the statement in the affidavit regarding the difficulty in penetrating the barriers around certain of the targets.

The Court has reviewed the report, Ex. Q to the supplement, containing the information and finds that while Padilla did give a fair amount of information, its usefulness is not readily apparent. For example, he recounted DeLeon–Gutierrez's address and how he came to live there. Information to help identify the address as well as about the vehicle he drove was also included. Information regarding drugs that was included had to do with his practice of leaving town when a shipment is received, and how this explained his recent absence. The report also listed the first name of an individual who allegedly distributed drugs for DeLeon–Gutierrez.

While this information, if accurate, clearly shows some access to DeLeon–Gutierrez, it does not show that the statement in the affidavit regarding the difficulty in gaining information from confidential sources was inaccurate. Much of the information included in the report and discussed above is useful as background in-

---

**6.** Several Defendants also attack Special Agent Butler's testimony that there were no Spanish-speaking agents available to assist in her investigation prior to the wiretap. Defendants argue that the Agent failed to inform Judge Kane that 'agents with Spanish-surnames' were involved in the investigation, as if that somehow indicates that those agents must speak Spanish. There is no evidence to support Defendants' implied assertion of the language skills of these agents. Furthermore,

the Court finds that the fact that Spanish language translators would be hired after an application for a wiretap is approved is irrelevant to the issue of necessity.

**7.** The Court notes that the information was not about Defendant Pelayo–Arciniega, but about Defendant DeLeon–Gutierrez instead. Nevertheless, because the evidence is presented on the issue of necessity, the Court will consider it, for what it is worth.

formation regarding DeLeon–Gutierrez but does not go the heart of proving that he is involved in a widespread distribution network.

Finally, several Defendants also argue that the Government failed to make greater use of confidential sources or undercover agents because Special Agent Butler and Assistant U.S. Attorney Jim Murphy had decided at the beginning of the investigation to use a wiretap. Consequently, Defendants argue, other methods of investigation, including confidential sources and undercover agents, "were unnecessary for them." (Closing Arg. of Defendants Pelayo–Arciniega, Rangel, Ramirez–Encarnacion, Abeyta, Trujillo–Valdez and DeLeon–Gutierrez (hereinafter referred to as Joint Closing Arg.) at p. 11).

The Court does not agree with Defendants that Special Agent Butler's candid testimony that she may have begun working on the wiretap affidavit as early as August or September 1999, is an admission that she never intended to do a thorough investigation because a wiretap would be easier. The background section of the affidavit contains information about events beginning in January and February 1999 that focused the attention of the Glenwood Springs DEA office on these individuals. Defendants can hardly complain that six or seven months later, Special Agent Butler was contemplating the use of a wiretap. During her testimony at the wiretap hearing, Defendants attempted to pin the Agent down as to when the decision was made to request a wiretap. Although she admitted that the possibility of such an application was considered at some point prior to that time, Special Agent Butler indicated that it wasn't until August or September 1999 that she started drafting the affidavit. There is no evidence that a decision had been made before that happened.[8]

In addition, the first wiretap affidavit is fifty-two pages long. Considering both the length and the fact that the events contained in it go back many months, it is not unreasonable, or suspicious, that the drafting was begun in August or September 1999. The affidavit includes information that was gathered from a variety of sources about wide ranging investigations. The Court rejects the argument that beginning preparation several months before filing indicates that the investigators intended to 'take the easy way out.'

### Grand Jury and Witness Interviews

The affidavit contains a fairly typical description of the weaknesses of using a grand jury to investigate a drug distribution conspiracy. It is undeniable that the possibility of witnesses taking the Fifth Amendment, fleeing the country, or destroying evidence are inherent in announcing an investigation to targets by summoning them before a grand jury.

Similarly, interviewing targets or their associates also has major limitations based on the unavoidability of alerting the participants to the existence of the investigation. Nevertheless, the affidavit contains a discussion of several connected individuals who had either refused to cooperate with law enforcement officials or had indicated by their behavior that if approached, they would be unlikely to cooperate.

Defendants make various arguments about what they characterize as the Government's failure to make adequate use of grand jury and witness interviews as tools for investigation. For example, while it is argued that some Defendants could have been arrested early in the investigation and interviewed for information that would be helpful to the overall investigation, there is nothing to suggest that such a plan would have been worth the costs. Agents need not try any alternative, no

---

**8.** The Court also rejects Defendants' argument that Special Agent Butler should have informed Judge Kane of when she started drafting the affidavit as if that would somehow tell him that she had done it prematurely. The Court has no doubt that Judge Kane, like the undersigned, would prefer that any wiretap affidavit be drafted over a period of time so as to allow for it to be well thought out and sufficiently reviewed.

matter how unlikely to succeed, to avoid the necessity for a wiretap. For example, the argument that an individual should have been arrested and taken before the grand jury "to determine whether or not he would cooperate" ignores the potential costs of such a ˙action when there is no information to suggest that it would be successful. (Closing Arg. of Nalvor Ramirez at p. 4). Obviously the investigators must weigh their choices more carefully.

In her closing argument, Defendant Mary Ramirez begins by arguing that Special Agent Butler's statement in the affidavit that interviews would produce insufficient information on the identities of the participants in the drug distribution network was misleading because a diagram had already been produced which contained the name of "almost every" person indicted in this case. (Closing Arg. of Mary Ramirez at p. 6). She goes on to argue that the "limited amount" of information in the affidavit would cause Judge Kane to believe that there were many other people to be discovered with the help of a wiretap. *Id.* Defendants involved in the Joint Closing Argument further argue that the diagram also identified the source of the drugs and the location of the drugs.

Defendants' argument is without merit. First, the interview section of the affidavit does not merely discuss the need to identify all the people involved in the conspiracy. It also discusses the need to get information about the source and location of the drugs, and other pertinent information. While it is true that the diagram included some information under each of these subjects, the diagram itself has never been identified as admissible evidence. Indeed, it is unlikely that it ever could be. The diagram was likely a product of previous investigatory work, but also projections, and even guesses, on the part of the inves-

tigators. Without admissible evidence to back it up, it was of no use.

Defendants also seem to assume that Special Agent Butler knew when she wrote the affidavit that her diagram was nearly complete and correct, if indeed it was.[9] Nevertheless, Defendants fail to point out what in the affidavit would lead Judge Kane to believe there were "a score" of additional participants to be identified. (Closing Arg. of Mary Ramirez at p. 6).

Defendants go on to make arguments based on the prior arrest of individuals in the related California indictment. Defendants argue that there was a "wealth of information from the indictments and arrests" in the California case and that not only did Special Agent Butler fail to mention that indictment in her affidavit but she also failed to make use of those arrested in California for interviews and grand jury testimony.

This subject has been dealt with previously in the Court's September 21, 2000, Order regarding *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978). As the Court stated at that time, not only would the Court not impute any evil motive to the failure to include this information in the affidavit but the Court also fails to see how the mere existence of the indictment would have been material to Judge Kane's necessity determination for this application.[10]

As far as Defendants' arguments regarding the huge potential for information from the California defendants, the Court finds that argument speculative at best. Despite the arguments to the contrary, the Court does not believe that Special Agent Butler should have taken trips to California to determine for herself whether the individuals in California were willing to be

---

9. As the Court does not yet have intimate knowledge of the facts at issue in this case, it *is not in a position at this point to know* whether all the statements recounted on page 7 of the Joint Closing Argument are correct regarding the source and location of the drugs.

10. The Court also finds that the fact that "higher echelon" targets were under indict-ment *in California but were fugitives in that* jurisdiction would be similarly unpersuasive as to necessity in this investigation.

interviewed with regard to the Colorado investigation. There is no evidence to suggest that she would have gotten any different answer than the California-based DEA agents who had already inquired.

Another argument raised by Defendants related to witness interviews is what they consider to be a lack of effective use of confidential sources, including Emmett Grazier.[11] A large part of this argument has to do with Defendants' assertion that Special Agent Butler could have made much greater use of Grazier than she did. The Joint Closing Argument makes much of the fact that Special Agent Butler stated that she could have arranged a situation which would have allowed her to continue to use Grazier.

While Defendants are correct that it appears that Special Agent Butler could have continued to use Grazier, it is also true that she gave credible reasons for her decision not to do so. These included the facts that he was an addict who she believed would return to dealing drugs and would eventually disclose to Defendants his knowledge of the investigation. Under those circumstances, it was reasonable for Special Agent Butler to decline to make further use of Grazier.

The Court finds that Defendants' other arguments on the subject of the use of the grand jury and witness interviews are without merit. For example, the closing argument of Defendant Nalvor Ramirez contains statements on page 4 regarding the willingness of several individuals to cooperate with the Government. Although these statements are expansive in their expressions of the desire to assist the Government, neither contains any citation to evidence which is the source of the information. The Court is not aware of any such evidence.

Based on the foregoing, having considered all of Defendants' arguments on the issue of the use of the grand jury as well as witness interviews, the Court finds that Defendants have failed to show that there are deficiencies in those sections of the affidavit in support of the application for 99–WT–16 which undercut the finding that a wiretap was necessary.

### Surveillance

This traditional investigative method is another contentious one in this case. While it is true that the affidavit does not include a description of the many instances of surveillance that this Court knows, through testimony and exhibits, took place prior to the filing of the affidavit, it does contain a detailed account of the factors which made surveillance difficult during this investigation. Those factors include the rural environment in which the dairy was located, the fact that the target locations were set back from roads which did not have much traffic or many vehicles parked and the fact that there was little vegetation to camouflage a car parked to do surveillance.

As a preliminary matter, the Court finds that these factors are eminently reasonable. The wiretap affidavit was submitted in November 1999. Obviously the vegetation would be at a minimum at that time of year and it would be many months before it grew back. It also makes sense that a vehicle doing surveillance cannot blend into the background if the background is a rural road with no other vehicles on it. The lack of a steady stream of traffic on the road would clearly inhibit the ability to be inconspicuous in watching the premises.

---

11. The Joint Closing Argument also argues that paragraph 79 of Ex. D is misleading because it states that previously arrested co-conspirators have refused to cooperate with law enforcement. Defendants argue that Emmett Grazier was a co-conspirator who did cooperate. While it is true that Grazier had been arrested prior to his assistance to this investigation, his cooperation was more prop-

erly discussed where Special Agent Butler included it, in the Confidential Source section of the affidavit, as his arrest was apparently not directly related to this investigation. Consequently, while he **may** have been determined later to be a co-conspirator, it does not appear that he had been identified as one at the time he was arrested.

Defendants' arguments that the rural nature of the area was not a major factor making surveillance difficult are totally without support.

Defendants attack these factors for various reasons. Defendant Mary Ramirez describes them as "feeble" but an examination of the reasoning for this opinion reveals that it is directed to the "related techniques" that she discusses in the same section. (Closing Arg. of Mary Ramirez at p. 4). Similarly, Defendant Nalvor Ramirez states that surveillance was "considered and determined to be nonworkable." (Closing Arg. of Nalvor Ramirez at p. 2). This is an inaccurate statement of the evidence. Even the affidavit states that physical surveillance will continue to be used when it is feasible. (Ex. D to Government's response at ¶ 84). Testimony at various hearings as well as exhibits attached to pleadings and introduced at hearings make it clear that a substantial amount of surveillance was done in this investigation. Investigators did not abandon this traditional investigative method just because it was difficult.

Indeed, in his supplement to his motion to suppress, Defendant Pelayo–Arciniega argues that a report produced by the Montrose Police Department shows that there was no difficulty doing physical surveillance. (Ex. O. to Supplement). The problem with this argument is that the report makes it clear that the police were following Confidential Informant # 809, with whom they had just met, to arrange for him to do a controlled buy. Obviously it was not a problem if the informant saw the police follow him to the buy. At no time was the seller traveling in the car with the informant. Consequently, this is not an example of easy, or even successful surveillance in the traditional sense of the word.

The Joint Closing Argument and the Closing Argument of Mary Ramirez share an argument that because there were only two DEA agents assigned at the beginning of the case, it can be inferred that a wiretap was planned from the outset. The Joint Closing Argument says Special Agent Butler "failed to disclose" numerous statements that it sets forth with no citation of authority. (Joint Closing Arg. at p. 3). These include matters such as "Special Agent Butler failed to disclose that once she enlisted the required people to conduct surveillance, surveillance would be simple." *Id.*

Many of these statements are misleading, if not totally inaccurate.[12] While it may be true that there were only two DEA agents from the Glenwood Springs office assigned to this case at its inception, that does not mean that there were insufficient personnel working on the investigation. To begin with, the investigation into this matter grew, to some extent, out of the wiretap that resulted in 99–CR–114, United States v. Orozco–Pulido et al. There is no reason to think that Special Agents Butler and Baldwin were the only agents assigned to that investigation. It is also clear from the affidavit that numerous local law enforcement agencies, such as the Montrose Police Department and the Grand Valley Joint Drug Task Force were involved in this investigation **prior** to the application for the wiretap.

As for the argument that Special Agent Butler 'failed to disclose' that there were only two agents on the case because a wiretap had been planned from the beginning of the investigation, the Court does not agree that Defendants' inference is warranted, or supported by Special Agent Butler's testimony. This is based on both the fact that a substantial amount of surveillance was attempted prior to the application for the wiretap and that other agencies were assisting the DEA. The Court finds that Defendants' argument that in-

---

**12.** The Court also notes that this section contains a statement that Defendants argue that Special Agent Butler "does not remind the Court" about. (Joint Closing Arg. at p. 10).

The statement referred to is in the affidavit so it is unclear where Special Agent Butler would be doing this 'reminding.'

vestigators were essentially 'cruising' until they could get a wiretap is without merit.

Similarly, the argument that getting wiretap authorization would afford Special Agent Butler 'countless' agents to assist in the surveillance which would be 'simple' once 'appropriate resources' were applied is simply not supported by the evidence. As set forth above, the factors which made surveillance difficult in this investigation did not change just because there were more agents working on it.

The Joint Closing Argument relies on a single incident of successful surveillance to support its position that surveillance would be simple with adequate resources. It is emphasized that the surveillance involved seven law enforcement officers and continued for over three hours. What Defendants fail to point out is that the portion of the surveillance which took place at the dairy, the main focus of the investigation, lasted for only fifteen minutes.[13] In any event, the fact that authorization for a wiretap afforded the DEA additional resources with which to conduct its investigation is not something that shows there was no necessity for a wiretap, as along as sufficient resources were expended prior to the application. The Court finds that the record, and affidavit properly support that adequate attempts were made at surveillance prior to the application.

### Search Warrants

The section of the affidavit which deals with search warrants begins with a discussion of why Special Agent Butler believed that search warrants would not be adequate to provide evidence of the full scope of the conspiracy. These included that records of drug transactions, even when they can be found, are often difficult to interpret and fail to give a complete picture of the conspiracy. Nevertheless, she

recounts that state search warrants have been obtained and have aided the investigation. No details of these state search warrants are given but the affidavit does state that while they have revealed additional coconspirators, they have not led to prosecutable cases against upper level conspirators.

Defendants do not attack the veracity of the statements regarding the limited usefulness of search warrants but instead argue that Special Agent Butler failed to inform Judge Kane that the search warrant that was executed on the home of Emmett Grazier resulted in his participating in a controlled buy. (Closing Arg. of Mary Ramirez at p. 8 and Joint Closing Arg. at p. 10). While this was certainly a good outcome, the Court wonders what it is about this that is so crucial that Defendants believe it would have made a difference to Judge Kane regarding necessity. Surely they cannot be inferring that execution of search warrants normally results in such a beneficial aftermath.

In any event, the controlled buy by Emmett Grazier merely proves the point in the affidavit. As set forth in ¶ 75 of the affidavit, when Grazier went to make the buy, he was not allowed to deal directly with Nalvor Ramirez but was required to wait for Mac Valdez to obtain the drugs from Ramirez. Consequently, even the fortunate result of a controlled buy showed how the upper level conspirators insulated themselves from even known associates like Grazier.

Defendants' other argument in regard to search warrants is similar to a previous argument on the subject of witness interviews: that investigators were already aware of the full scope of the criminal activity prior to their application for the

---

**13.** The Joint Closing Argument also emphasizes that it 'strains credulity' that a DEA agent would not have know that a 'higher echelon target of his investigation, who was under indictment in California, was providing him with a cell phone number.' (Joint Closing Arg. at fn. 6). The Court is uncertain as to whether Defendants are incredulous that

Special Agent Baldwin failed to recognize Jose Martinez or that Martinez was giving him a cell phone number. In either case, the Court fails to understand why Defendants think the agent should have automatically recognized a wiretap target who is based in California, or why providing a cell phone number was significant.

wiretap. (Closing Arg. of Mary Ramirez at p. 8–9 and Joint Closing Arg. at p. 10). Again this argument is rejected as Defendants have failed to show either that the investigators knew that they had identified most of the participants in the group or that they had prosecutable cases against those participants.

Defendants also make the sweeping argument that if the DEA had just executed simultaneous search warrants at places such as the dairy, Nalvor Ramirez's trailer, and the other trailers on the property, great progress could have been made in the investigation. (Closing Arg. of Mary Ramirez at p. 9 and Joint Closing Arg. at p. 10). Needless to say, Defendants fail to point out **when** investigators had information sufficient to obtain warrants for all these locations, much less be successful at all of them so as to cripple this organization. The Court finds that Defendants' argument is unrealistic and therefore without merit.

### Other Methods of Investigation

Defendants made several other arguments regarding methods of investigation which they say would have afforded investigators success, obviating the need for a wiretap.

The first of these is a consensual wiretap. (Closing Arg. of Mary Ramirez at p. 4, Closing Arg. of Nalvor Ramirez at p. 2, and Closing Arg. of Hector Gutierrez Dias at p. 2). The Court must dispel Defendants' notions regarding this method. All three Defendants assume that a consensual wiretap could be done on the telephone of the dairy because the owner of that phone line would agree to the tap.

Unfortunately, as Special Agent Butler testified at the wiretap hearing, that would not be a legal consensual wiretap. "Any person not a sender or intended receiver of a telephone or telegraph communication commits wiretapping if he knowingly overhears, reads, takes, copies, or records a telephone, telegraph, or electronic communication **without the consent of either a sender or receiver** thereof or attempts to do so." C.R.S. § 18–9–303(1)(a) (emphasis added). In other words, the consent of the owner of the telephone line is irrelevant to the issue of consent to tap the phone line. Consent can only be given by a party to the conversation. There are no allegations that there were any individuals in this case who would have given such consent to record conversations that would have been helpful to the investigation.

Another alternative method of investigation relied on by Defendants regarding the necessity argument is trash pickup. Defendant Nalvor Ramirez argues that Special Agent Butler testified that trash pickups were neither considered nor attempted, despite the cooperation of Jess Grett. (Closing Arg. of Nalvor Ramirez at p. 2). Defendants Mary Ramirez and Hector Gutierrez–Dias also attack the failure to search the trash coming from the trailers. (Closing Arg. of Mary Ramirez at p. 4, and Closing Arg. of Hector Gutierrez Dias at p. 2). Mary Ramirez specifically takes issue with the investigators' failure to "follow trash trucks removing trash from the Ramirez property."

Unfortunately none of the Defendants tailor their arguments to the evidence as presented at the wiretap hearings. Special Agent Butler did not testify that trash pickup was not considered. Instead she testified that the idea was rejected as not being feasible. The reason for this was that rather than the trash being picked up at the trailers, as would commonly happen in an urban setting, the residents of the trailers took their own trash to the local dump. Consequently, rather than making arrangements with a trash company or following a trash truck, looking through this trash would require doing surveillance at the dump to see which containers of trash belonged to Defendants. How this could be accomplished is not explained by Defendants, who once again assume that it could be done.

The supplement filed by Defendant Pelayo–Arciniega also makes an argument which touches on several categories of alternative investigative methods. His argu-

ment relates to a September 15, 1999, DEA–6 Report regarding a traffic stop which Defendants received early this month. He argues that this report details the use of three traditional investigative methods and therefore shows the lack of necessity for a wiretap.

Of course there is another way to look at the incident to which Defendant refers. First there is the fact that it shows that these methods of investigation were being used prior to the application for the wiretap. This again shows that effort was being made that did not involve any reliance on a wiretap. In addition, this traffic stop raises the question of what was accomplished by the use of these alternative methods. The report reveals that money and drugs were seized from two individuals who are not defendants in this case. There is no indication that either of the individuals from whom the items were seized has provided any assistance to the Government. It further seems that no admissible evidence was seized from Defendant. Consequently, it appears that the use of these alternative methods came to naught in this instance.

Finally, Defendant Pelayo–Arciniega's supplement makes an argument based on newly disclosed evidence regarding closed circuit television. The report in question, Exhibit N to the Supplement, states that in August 1999 two agents, one from the Colorado Bureau of Investigation and the other from the Federal Bureau of Investigation, went to Olathe to do video surveillance using a closed circuit television camera. It appears that the transaction surveilled occurred at the dairy. Although the end of the report referred to a videotape of the transaction, no explanation is given regarding the use of the closed circuit television camera. Likewise a review of the transcripts of the wiretap hearing reveals no testimony about a closed circuit camera, as opposed to the pole camera which was discussed at length.

It appears that Defendant is correct that the use of the closed circuit video camera was not disclosed in the wiretap affidavit. It is also true that Defendants are not to blame for the late disclosure of information regarding that method of investigation. Nevertheless, Defendants have received thousands of pages of discovery in this case. If Exhibit N is the only place where use of a closed circuit camera is discussed, it obviously was not a very useful tool in this investigation. Like any type of surveillance, it would, at best, provide images of people meeting without giving any information about the purpose or result of that meeting. The use of the closed circuit camera should have been mentioned in the wiretap affidavit but its absence is not significance enough to cause this Court concern about the necessity finding.

Based on the foregoing, the Court finds that the Government demonstrated sufficient necessity under 18 U.S.C. § 2518 to support the issuance of 99–WT–16. The Court is convinced that the application for the wiretap was not used as a shortcut in this case to either to make swift progress or to make up for a lack of resources on the part of the agency primarily responsible for the investigation.

Once again, the Court emphasizes that the necessity requirement is not an exhaustion requirement. *Castillo Garcia,* 117 F.3d at 1187. Consequently, the arguments made by Defendants regarding methods of investigation not used, even to the extent that they were actually feasible, are not, by themselves, persuasive on the issue of necessity.

The Court finds that the affidavit contains a sufficiently full and complete statement of alternative investigative methods that had been used or considered in this matter. Taking into account the rural nature of the area in which the investigation took place and the fairly isolated community in which most of the Defendants lived and worked, the array of methods available to the Government was limited. The Government has shown that it has not requested this application in a "situation[ ] where traditional investigative techniques

would [have] suffice[d] to expose the crime." *Castillo Garcia*, 117 F.3d at 1185 (10th Cir.1997). Consequently, the Court finds that the application satisfies the necessity requirements of 18 U.S.C. § 2518.

*Wiretaps 99–WT–17 and 99–WT–16 Extension:*

The Court understands that some, or all, of the Defendants are attacking all three wiretap orders at issue in this case. Nevertheless, a review of the materials submitted by the Defendants finds that the argument are specific to 99–WT16 and 'Exhibit D' to the Government's response, which was filed as part of the application for 99–WT–16. Similarly, some of the arguments clearly limit themselves to the first application.[14]

In addition, the Court notes that both the Joint Closing Argument and the Closing Argument of Defendant Mary Ramirez rely on language from *United States v. Arrington*, 2000 WL 775576 (10th Cir.), to the effect that if the necessity showing for the original affidavit is insufficient, then the necessity showing for subsequent applications would also be insufficient.[15]

Having found that the original affidavit is sufficient, the Court has reviewed the affidavits for the extension to 99–WT–16 and 99–WT–17, Exhibits E and F to the Government's response to the wiretap motions. The Court finds that both affidavits contain detailed sections explaining the necessity for the additional orders. The necessity sections in these affidavits are significantly longer than those in the original affidavit. They contain a great deal of additional information about the group's activities as well as the issues that have arisen from the knowledge that has been gained. This includes facts about previously unknown associates and the resulting problems of how to obtain information about those individuals. The affidavits also include information about new obstacles to the investigation that have arisen since the first affidavit, such as the counter surveillance done by Mary Ramirez. Additional methods of investigation that have been used since the first application, such as pole camera, as well as additional results of previously discussed methods of investigation are also discussed.

The Court finds that the applications for 99–WT–17 and the extension of 99–WT–16 include an adequate showing of the necessity for those wiretaps. The four corners of applications including Exhibits E and F show that the requirements of 18 U.S.C. § 2518 have been met.

**Failure to Make Application Upon Oath or Affirmation**

The Joint Closing Argument makes an argument that the application in 99–WT–16 fails to comply with 28 U.S.C. § 2518 because the application was not made "upon oath or affirmation to a judge." Defendants argue that "[b]ecause the oath or affirmation was done after the order was signed by Judge Kane."

Defendants have assumed a fact not in evidence. As discussed, the application and related materials, including the affidavit were provided to Judge Kane several days before November 12, 1999. The reason for this is because the affidavit alone is over fifty pages long. Obviously it would be inefficient for an agent and an Assistant United States Attorney to sit in chambers and wait for a judge to do a thorough review of the proffered materials. The documents were unsigned when they were given to Judge Kane. The primary reason for this is because the purpose of giving

**14.** See, e.g., "In summary, the totality of the information provided in the **initial affidavit** when coupled with the numerous instances of Agent Butler's failure to give full and complete information of the wealth of facts known to her at the time of the **initial wire tap application** ..." (Closing Arg. of Mary Ramirez at 11).

**15.** Defendants make an argument in relation to *Arrington* regarding the constitutionality of Tenth Circuit Rule 36.3 which limits the precedential value of unpublished decisions. The Court need not make any determination regarding the constitutionality of that rule as it has considered Defendants' arguments based on *Arrington* and given them such effect as is appropriate under the circumstances.

the documents in advance is to allow the judge to do a preliminary review and determine if he has any concerns about the materials that could be addressed by the agent and the attorney.

The Court takes judicial notice that ordinary procedure provides that a day or two after the documents are provided to the judge, the agent and the Assistant U.S. Attorney have an appointment with the judge. At that time, the application and affidavit are signed upon oath or affirmation to the judge. It is only after the application and affidavit are signed and acknowledged that the judge will sign the order granting the application. The Court has reviewed the transcript of the wiretap hearing and has found no testimony that the order was signed prior to the signing of the affidavit upon oath or affirmation. Again, the Court takes judicial notice that would not be normal procedure. In the absence of any evidence to the contrary, the Court will not assume that such an unusual and improper sequence took place.

■ Furthermore, to the extent that Defendants argue that it is improper for a judge to review an unsigned affidavit, they have presented no authority for that argument. As long as no action has been taken on the application while the affidavit is in an unsigned condition, the Court cannot find that the judicial economy served by a preliminary review of the materials is improper. The cases relied upon by Defendants do not compel any different result. Consequently, Defendants' argument regarding failure to make application upon oath or affirmation is rejected.

### Minimization

Most Defendants also attack the Government's minimization of the telephone calls intercepted. Their arguments begin with a general argument that the Government failed to comply with 18 U.S.C. § 2518(5).[16]

■ "The starting point for review of the adequacy of minimization efforts is an

examination of the reasonableness of the agents' efforts to refrain from monitoring conversations deemed nonpertinent to the investigation. Reasonableness must be determined from the facts of each case." *United States v. Willis*, 890 F.2d 1099, 1101 (10th Cir.1989).

■ The affidavits presented provide a plan for minimization which satisfies the mandates of 18 U.S.C. § 2518(5). The Government also introduced as exhibits at the hearing a copy of the very thorough minimization instructions that it provided to the agents and telephone monitors involved in these wiretaps. Those instructions were acknowledged by the agents and monitors by being signed by those individuals.

The testimony at the hearing provided evidence on the issue of the percentage of intercepted calls that were minimized. Special Agent Butler testified that eighty-two percent of the Grett Dairy calls were minimized while fifty-nine percent of the calls from Gloria Ramirez's phone were minimized. The reason given for the lower percentage on the latter telephone number was that the order on that phone line was in effect for a much shorter period of time than the other one. "During the early stages of surveillance the agents may be forced to intercept all calls to establish categories of nonpertinent calls which will not be intercepted thereafter." *Scott v. United States*, 436 U.S. 128, 141, 98 S.Ct. 1717, 56 L.Ed.2d 168 (1978). While the percentage of calls minimized is not determinative on the issue of minimization, it does provide assistance in deciding the issue of reasonableness. *Id.* The Court finds that the Government has presented evidence of an appropriate plan for minimization.

■ "Once the government has made a *prima facie* showing of reasonable minimization, the burden then shifts to the defendant to show more effective minimization could have taken place." *United*

---

16. See e.g. Closing Argument of Gutierrez Dias at 2.

*States v. Willis*, 890 F.2d at 1102. Several Defendants make specific arguments on this subject.

Defendant Mary Ramirez argues that the minimization standards were not fulfilled because the wiretap monitors typed a synopsis of each call to which they listened, whether or not it was pertinent.

The Court fails to see the problem with this practice. Special Agent Butler testified that when a call was minimized, the audio was disconnected. (Transcript of Hrg. 8/ 8/00 at p. 406). It could not be heard by the monitors and was not recorded. *Id.* The distinction between pertinent and nonpertinent calls is one created by the Government after analyzing calls that were intercepted, recorded and summarized. The purpose of the pertinent/nonpertinent designation was to identify which calls would be used at trial and inform Defendants of the evidence against them.

The statute does not refer to 'pertinent' or 'nonpertinent' calls. To the extent that Defendant is attempting to expand the requirement of minimization to calls that were not minimized but were later determined to be nonpertinent, the Court must reject the argument. The only information that Defendant gives about these calls is that, because they were not minimized, a synopsis of the conversation was created by the monitors. Certainly Defendant could attack the lack of minimization of the calls, if adequate information was given as to why they should have been minimized, but to merely argue that synopses were done when they were nonpertinent is meaningless from a statutory point of view.

Ms. Ramirez also argues with the 'two minute rule' and the subsequent authority to do spot checks approximately every thirty seconds. It is her position that such a policy would allow a monitor to reconnect after the thirty second disconnect and listen for the remainder of the call. Under those circumstances, the call would still be designated as minimized because of the initial disconnect.

The Court finds that this argument is based on confusion related to the evidence. First, the testimony of Special Agent Butler was that the monitors were told that they could listen for approximately two minutes and should disconnect at that point if the call did not appear to be relevant to the investigation. After that, monitors were told that they should reconnect to the call approximately every thirty seconds to determine if the conversation had become relevant. (Transcript of Hrg. 8/ 8/00 at p. 407–08).

Furthermore, while it is true that Special Agent Butler agreed with counsel at some point that there is no way to determine how much time had been minimized from a call, it is clear from reviewing her testimony that she was mistaken. She also stated, "The minimization does not affect the duration of the call." (Transcript of Hrg. 8/8/00 at p. 407, lines 12–13). Consequently, Exhibit G to the Government's response to the wiretap motions, shows the total time for each call, whether or not the whole call was recorded.

Since the CD–ROMs given to Defendants in discovery contain all the phone calls which were recorded, Defendants could have determined whether any of the calls were minimized for only a brief time but then recorded for the remainder of the call. This could be done by timing the recorded portion of any call, and then subtracting that recorded time from the total listed time for the call, as set forth in Exhibit G. This would leave a figure showing how much of the call had been minimized. As Defendants have always had the capability to examine the evidence on this issue, and have nonetheless declined to make any showing to the Court that there was improper minimization of this type, the Court declines to assume that investigators essentially 'artificially minimized' calls. Consequently, the Court rejects this argument.

The Joint Closing Argument also contains a statement that the method of spot checking used was inappropriate, although

those Defendants acknowledge that spot checking, in general, is an acceptable practice. As previously noted, the testimony at the wiretap hearing indicated that the basic method of spot checking was that after a call was originally minimized, the monitors would briefly reconnect to the call to determine if the conversation had turned to a relevant subject. This was done approximately every thirty seconds. The Court finds that the method of spot checking done on these wiretaps was appropriate.

Defendant Nalvor Ramirez makes an argument that testimony at his detention hearing, held before this Court, shows that calls which were about purely family matters were recorded when they should have been minimized.

There are several problems with this argument. First, like most of the Bates numbered documents referred to by Defendants, the Court does not have the discovery in this case, unless it was attached to a pleading or entered as an exhibit during a hearing. This includes the CD–ROMs containing the phone calls. However, the Court does have a transcript of the detention hearing. While it is true that there was testimony about phone calls discussing a birthday party, child support and other similar subjects, that alone does not make the calls appropriate for minimization. Nor do these limited instances establish a pattern of improper minimization.

Defendant argues that these unspecified calls "had no reference whatsoever to any drug trafficking" as if that is determinative on the issuance of their relevance to this investigation. (Closing Arg. of Nalvor Ramirez at p. 7). He ignores the testimony of Special Agent Butler that the reason the calls were recorded was because they included discussions of Defendant travelling to and transferring money to Mexico. Those are legitimate subjects for investigation and therefore justify the recording of those calls. While it is possible that some of the calls referred to by Defendant should not have been recorded, "[m]inimization does not require perfection in differentiating between innocent and criminal conversations." *United States v. Killingsworth,* 117 F.3d 1159, 1166 (10th Cir. 1997).

The Government has made such a *prima facie* showing of a proper plan for minimization and Defendants have failed to counter it with any evidence that more effective minimization could have taken place. Consequently, the Court finds that the calls recorded in these wiretaps were adequately minimized.

Having found that the three wiretaps at issue fulfill the statutory requirement for necessity and minimization;

It is, therefore, ORDERED that Defendants' Motions to Suppress Electronic Surveillance Evidence are Denied.